MFC Systems (Appendix D)   $2,173,572 $\times \dfrac{.12}{365}$ = 715

Total   $7,822,620   $ 2,572

## UNITED STATES FIDELITY & GUARANTY CO.

### v.

## The UNITED STATES.

### No. 182–78.

United States Court of Claims.

April 7, 1982.

Mark B. Goodwin, Washington, D. C., attorney of record, for plaintiff; Steptoe & Johnson, Washington, D. C., of counsel.

Stephen G. Anderson, with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

A surety sues the United States to recover a progress payment made, allegedly wrongfully, by the Government to the surety's contractor. After a trial, Trial Judge Fletcher held for the defendant. Plaintiff excepts to the trial judge's opinion, one of

his findings, and to his conclusion that the petition should be dismissed. Defendant supports the trial judge, with the exception of footnote 27 in his opinion.

Upon consideration of the briefs and oral argument, the court agrees with the trial judge and holds for the Government. We adopt his opinion (except for footnote 27 which we have deleted, and for which we substitute our own footnote 27) and findings as the basis for our decision.* Plaintiff cannot recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge: By this suit, plaintiff, United States Fidelity & Guaranty Company ("USF&G"), is attempting to recover approximately $17,000 in progress payments which it alleges were wrongfully made to a construction contractor by the Government on contracts for which USF&G was surety and on which, plaintiff alleges, the contractor had previously declared default. USF&G asserts that these progress payments should have been either retained by the Government or paid to the surety to be used by it in paying unpaid bills of the contractor and in completing the contracts.

The factual context of this case is somewhat complex and is further complicated by a number of outright contradictions between the testimony of plaintiff's witnesses and those who testified for the Government. Therefore, before the rights and liabilities of the parties are decided, a summary recitation of the facts, highlighting the disputes between the parties, should be helpful.

In the summer of 1976, Bard Construction Company, Inc. ("Bard Construction") was awarded two Government contracts for construction projects at the Anniston Army Depot in Anniston, Alabama. One contract was for the construction of a first aid station at the depot ("aid station contract"). The other was for concrete and paving repairs at the depot ("paving contract"). The

* Although the court adopts the trial judge's findings of fact, they are not printed with this opinion, which contains the facts needed to understand our decision.

scheduled completion dates for these contracts were January 15 and 16, 1977, respectively. The performance and payment bond surety on both contracts was USF&G.

Work on both contracts proceeded satisfactorily and on schedule. At the end of each calendar month Bard Construction would submit a request for progress payments on the contracts. Each request was approved and the payments were made directly to Bard Construction. On December 7, 1976, the Army approved Bard Construction's request for the fifth progress payment on both contracts.[1]

In mid-December, the owner of Bard Construction, Mr. Philip Bard,[2] contacted USF&G regarding financial difficulties his company was experiencing. Concerned that USF&G would incur financial obligations because of its bonding of the Bard contracts,[3] James Smith, supervisor of USF&G's Birmingham, Alabama Claim Department, wrote to the Army contracting officers for each contract, informing them that Bard had unpaid bills which would probably have to be paid by USF&G. Accordingly, Mr. Smith requested that checks for any accumulated contract funds be forwarded to USF&G instead of to the contractor. These letters were received by the Army on December 23, 1976.[4]

On December 29, 1976, Mr. Bard met with Mr. Smith and Foster Etheredge, local counsel to USF&G, to discuss his company's financial problems. At this meeting, Mr. Bard gave the USF&G representatives lists of his company's outstanding financial obligations totaling over $50,000 on the two Army contracts.[5] He said that because of

its financial condition his company would have to default on the two contracts. Mr. Etheredge advised Mr. Bard that it would be necessary to document the defaults. Accordingly, four letters were prepared for Mr. Bard to sign. Two of these letters, addressed to the purchasing and contracting officer at Anniston Army Depot, directed that all monies due on the Bard contracts be paid to USF&G ("direction to pay letters").[6] The other two letters were addressed to USF&G. One assigned all monies arising under both contracts to a trust for the benefit of creditors of Bard Construction and USF&G ("trust letter"). The other letter said that due to the amounts of outstanding bills and obligations incurred in the performance of both contracts, Bard Construction was now in default in the performance of both ("default letters").

The two "direction to pay letters" were received by the Army contracting office on January 3, 1977. Also on this date, two letters from Bard Construction Company were received. These two letters, each referencing one of the contracts between Bard and the Army, requested a 30-day extension of time for completion of the contracts.

Reece Lindon, chief of the Purchasing and Contracting Division of Anniston Army Depot was to begin a week of vacation on January 3, 1977. However, he came into the office for the first two hours of that day, before any of the above letters were received. At that time, in response to the letters from USF&G received in his office on December 23, 1976, Mr. Lindon asked Mrs. Martha Wallace, the contract adminis-

---

1. These requests were based upon Government approved estimates that, as of November 30, 1976, the aid station contract was 64 percent completed and the paving contract 84 percent completed.

2. Unfortunately, Mr. Bard died prior to the commencement of this litigation.

3. USF&G was performance and payment bond surety on a total of four construction contracts held by Bard Construction. Mr. Bard had informed USF&G officials that his company's financial problems would impair its performance on all four of these contracts.

4. The letters were dated December 21 and 22, 1976.

5. The totals of outstanding obligations projected on these lists by Mr. Bard were $39,812.15 on the paving contract and $18,643.66 on the aid station contract.

6. These two letters were identical except that one referenced the paving contract and the other referenced the aid station contract. Also, the letters stated that the direction to pay could not be withdrawn or altered without the written consent of USF&G.

trator for the Bard contracts, to contact USF&G to report that the matter discussed in these letters was being investigated. Later that day, Mrs. Wallace spoke to Mr. Smith at USF&G. At this time, a meeting to discuss the Bard contracts was arranged for January 10, 1977, Mr. Lindon's first day back at work.

During the week of January 3 through 10, 1977, the Army contracting office received three more letters concerning the Bard contracts. One was a letter dated December 30, 1977, from Crestview Plumbing and Heating Company, a subcontractor on the aid station contract, stating that it had not received payment from Bard Construction for four monthly invoices in the total amount of $10,784.86. The other two letters, dated December 31, 1976, were from Bard Construction requesting the sixth progress payment on each contract.[7]

On January 10, 1977, Mr. Lindon returned to work and was immediately informed about the upcoming meeting with USF&G representatives which had been scheduled for later in the day. Lindon, thereupon, reviewed the Bard contract file which in his absence had increased by 12 new letters or internal memoranda which referenced the Bard contracts. Mr. Lindon testified that, at this time, he failed to notice the "direction to pay letters" signed by Mr. Bard on December 29, 1976.

The USF&G representatives, Messrs. Smith and Etheredge, arrived for their meeting with Mr. Lindon. Mr. Etheredge, who had brought with him a file containing the four letters signed by Mr. Bard on December 29, gave copies of these to Mr. Lindon. Mr. Etheredge and Mr. Smith both testified that Lindon read the "default letter" and put the others to the side.[8] Bard's financial problems were discussed, and the USF&G representatives told Lindon that their company probably would not allow Bard to complete the contracts. Mr. Etheredge inquired whether there were any progress payments due on either contract. When he was told that there were, he asked that this money be paid to USF&G to be used by it to pay Bard's obligations and to complete the contracts. Lindon said this could not be done because of the ASPR 10–106(a).[9] Finally, the parties agreed that another meeting was necessary, and one was then scheduled for January 14, 1977.

In the meantime, Bard's requested extensions on both contracts were being considered by the respective contracting officers. On January 5, 1977, the contracting officer on the paving contract, Mary Davidson, approved a 19-day extension,[10] making the new completion date February 4, 1977. On January 12, 1977, Mr. Lindon, the contracting officer on the aid station contract, approved a 30-day extension, making the new completion date February 14, 1977. On January 12 and 13, Bard met with Army contracting officials to execute the formal extensions for both contracts. Sometime during the period from January 10 to 13, 1977, Lindon spoke to Bard regarding his company's progress on the two contracts.

---

7. The contractor claimed to have completed work valued at $40,600 on the $44,040 aid station contract, or 92 percent of the job. He also claimed to have completed $78,850 worth of work on the $84,000 paving contract, or 94 percent of that job. On the basis of these figures, the contractor sought progress payments of $11,070 on the aid station contract and $6,120 on the paving contract.

8. Mr. Lindon's testimony about the events of this meeting directly contradicts that of the plaintiff's witnesses. Lindon testified both on direct and on cross-examination that the USF&G representatives did not give him any documents in support of their claim that Bard Construction was in default on its two contracts with the Government.

9. This regulation says: "During performance of the contract the Government will not withhold contract payments due to the contractor or his assignee for the reason that subcontractors or suppliers have not been paid for work performed or supplies delivered." 32 C.F.R. § 10–106 (1976).

10. Bard had originally requested a 30-day extension on this contract due to inclement weather. However, investigation by contracting office personnel showed that work on the contract had actually been delayed only 19 days for this reason. Therefore an extension of 19 days was deemed sufficient.

Lindon testified that Bard assured him that, if his company received the sixth progress payments and the contract extensions, it could clear its account with Crestview and finish the contracts.

On January 14, 1977, Smith, Etheredge, and Lindon met as scheduled. Again, completion of the Bard contracts was discussed. At this time, Etheredge stated that since Mr. Bard had declared his company in default, USF&G would not allow the company to complete the contracts. Etheredge again requested that the progress payments, which were payable on that day, be made directly to USF&G. Lindon again refused to do this saying it was against Government regulations.[11] Lindon did agree to call Mr. Bard to come in and pick up the progress payments so they could be turned over to the USF&G representatives. Bard came to the Army depot and agreed to pick up the checks and turn them over to USF&G.[12] Bard and Lindon went to the pay office to do this. However, Bard returned to Lindon's office alone and refused to give the checks to Smith and Etheredge. Angry words followed and Bard abruptly departed with the checks. Thereupon Smith and Etheredge confronted Lindon, told him what had occurred, and Etheredge asked Lindon to stop payment on the checks. However, Lindon told him this probably could not be done.

After receiving the sixth progress payments, Bard Construction did not appear on the jobsite of either contract. In addition, none of its subcontractors appeared on either jobsite after this date with the sole exception of January 16, 1977, when one subcontractor appeared to work on the aid station contract site.

On January 26, 1977, Smith wrote Lindon demanding that the progress payments which were made to Bard on January 14, 1977, be restored to the contract funds available for completion of the contract. Attached to this letter were copies of: (1) Smith's letters to the Army dated December 21 and 22, 1976; (2) the "trust letter" signed by Bard on December 29, 1976; and, (3) the "default letter" signed by Bard on that same date.[13] In this letter, Smith reminded Lindon that he had been advised on January 10, 1977, that Bard was in default and that the "default letter" had been called to his attention. Smith also pointed out that on the same date, USF&G representatives had requested that all remaining contract funds either be paid to the surety or held for completion of the contracts and the payment of bills.

In response to this letter, Lindon called Smith to inform him that Bard was apparently going to be late in completing the paving contract[14] and suggested a meeting with USF&G representatives. A meeting was scheduled for February 1, 1977.

At this meeting, Lindon asserted that the Government had not yet received a proper notice of default from Bard, and, therefore, the contractor could not be considered in default. USF&G representatives said that Bard had declared his company in default by a letter of December 29, and that USF&G had apprised the Government of the circumstances of this default when presenting it with Bard's default letter on January 10, 1977. Lindon indicated that a meeting with Mr. Bard present was necessary. Accordingly, a meeting to discuss Bard's termination and the completion of the contracts was scheduled for the next day.

---

11. *See* footnote 9, *supra.*

12. Again, Mr. Lindon's testimony differs from that of plaintiff's witness with regard to the events of this meeting. Lindon testified that at this point Mr. Bard stated, in the presence of the USF&G representatives, that his company could complete the two contracts if it received the progress payments and the requested contract extensions. Smith's and Etheredge's accounts of the events of this meeting do not include any recollection of Bard making this statement.

13. Lindon testified that the first time he saw the "default letter" was upon receipt of the copy that was attached to Smith's letter of January 26, 1977.

14. No work had been done on this contract since before January 14, 1977.

On February 2, 1977, the parties again met with Mr. Bard present. At this time, Bard flatly stated that he could not complete either contract without additional money. Lindon asked Bard to write a letter indicating this. Bard agreed to do so, and such a letter was typed by Lindon's secretary and signed by Bard. USF&G's representative at this meeting, Mr. Etheredge, again asserted that Bard had already declared default on December 29, and that Lindon had been informed of this on January 10. Also, Etheredge reminded Lindon that he had been advised prior to January 14 that the sixth progress payments on the contracts should not be paid to Bard, but that the payments had been made anyway, contrary to USF&G's request. After this meeting the Government formally terminated Bard's contracts for default on February 2, 1977.[15]

In order to decide whether the Government contracting officer in this case should have withheld the sixth progress payments from Bard Construction, it is first necessary to explore the state of the law in this area as developed by decisions of this court. Three recent cases are distinctly relevant here. These are: *Argonaut Insurance Co. v. United States*, 193 Ct.Cl. 483, 434 F.2d 1362 (1970); *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973) (*USF&G–I*); and *Royal Indemnity Co. v. United States*, 208 Ct.Cl. 809, 529 F.2d 1312 (1976). Each of these cases involves a factual situation essentially similar to that in the present case. In each case, this court held that the surety had no right to recover against the United States.

In *Argonaut*, the plaintiff-surety had advanced funds to the financially troubled contractor who directed that all future progress payments be made to the plaintiff-surety. After realizing that the contractor was in dire financial difficulties, the surety refused to give the contractor any more financial assistance and informed the Government of the contractor's financial condition. The surety requested that no payment be made to the contractor without its consent. Thereafter the contractor, in consideration for a loan to finance the completion of the contract, assigned all future payments arising under the contract to a bank. The contractor also rescinded its direction that all payments be sent to the surety. The surety then had a meeting with the Government at which time it requested that the contract be terminated for default and that the progress payments then due be withheld. The Government officials refused to honor either of these requests. However, instead of being paid to the assignee bank, the then due but unpaid progress payment was deposited in a trust account and thereafter used for the completion of the project.

The surety sued for the amount of the progress payment, arguing that the Government should have allowed it to control the disposition of the amount of the progress payment necessary to reimburse it for its payment of the contractor's obligations to subcontractors and materialmen. In support of its position the surety relied upon a line of cases which involved the disposition of a final contract payment due after completion of performance.[16] In those cases the Government had notice that the surety was asserting rights to the final payment, but nonetheless, paid it to another

---

**15.** Following this meeting there were a series of three letters between Smith and Lindon. On February 8, 1977, Smith wrote to Lindon again to demand reinstatement of the contract funds paid to Bard on January 14 and to assert that Lindon had been aware of Bard's default since January 10. Lindon replied in a letter dated February 11, 1977, which stated that legally Bard had not properly declared default until February 2, 1977. Further, Lindon refused to reinstate the contract funds paid to Bard on January 14, claiming that under Government regulations he was prevented from withholding

progress payments from the contractor. Finally, in a letter dated February 22, 1977, Smith denied Lindon's assertion that the Government had no indication of Bard's default prior to February 2, 1977.

**16.** These cases were: *Newark Insurance Co. v. United States*, 144 Ct.Cl. 655, 169 F.Supp. 955 (1959); *Home Indemnity Co. v. United States*, 180 Ct.Cl. 173, 376 F.2d 890 (1967); and, *Hanover Insurance Co. v. United States*, 279 F.Supp. 851 (S.D.N.Y.1967).

party. The court in *Argonaut* distinguished these cases by pointing out that during performance of a contract, the Government's role is substantially different from that of a mere stakeholder of the final contract payment. 193 Ct.Cl. at 493–94, 434 F.2d at 1367–68. During performance of a contract, the Government has a vital interest in the contract's completion and, as such, its contracting officer is vested with broad discretion in administering the contract for the purpose of promoting performance. *Id.* On the facts in the *Argonaut* case, a unanimous court felt, speaking through then Chief Judge Cowen, that the contracting officer's decision not to terminate the contract and not to withhold the progress payment could not be considered an abuse of that discretion.

Faced with a similar factual situation in the *USF&G–I* case, the court, relying on its decision in *Argonaut*, held that the Government had no legal obligation to suspend a progress payment, during the course of performance of a contract, merely upon the demand of the surety. 201 Ct.Cl. at 14, 475 F.2d at 1384. Instead, the court said that " . . . where the Government representative is notified of the contractor's nonpayment of obligations during the performance of the contract, the representative is faced with the task of balancing the Government's interests in proceeding with the contract, against possible harm to the surety." *Id.*[17]

Finally, in *Royal Indemnity*, a case with facts similar to those above, the court adopted Trial Judge Wood's opinion *per curiam*. His opinion was written after the case had been remanded by the court with directions to determine whether the Government had " . . . acted in good faith and primarily to promote the continuation of the contract work, and whether, in light of all the facts and circumstances, defendant's actions were a reasonable exercise of its discretion or an arbitrary disregard of plaintiff's rights as surety and an abuse of such discretion." 208 Ct.Cl. at 821–22, 529 F.2d at 1319. The Trial Judge, acting pursuant to the court's order, found that the contracting officer had neither acted in bad faith nor abused his discretion in refusing to withhold the progress payment at issue in the case. 208 Ct.Cl. at 828, 529 F.2d at 1323. He noted correctly that:

> The standard of proof to be applied in a case where an arbitrary and capricious disregard of the surety's interests, and an abuse of discretion, are charged must be, and is, high. See *Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233 (1970). Where, as here, defendant is entitled to exercise its discretion, "plaintiff has an unusually heavy burden of proof in showing that the determination made . . . was arbitrary and capricious." *Continental Bus. Enterprises, Inc. v. United States*, 196 Ct.Cl. 627, 637, 452 F.2d 1016, 1021 (1971). [208 Ct.Cl. 823, 529 F.2d 1320.]

■ As stated by these three cases, the law in this area has become settled that so long as there is no showing of bad faith or an abuse of discretion, the decision of a Government contracting officer that a progress payment to a financially strapped contractor should not be withheld will be accorded deference by this court, and the surety's burden of proving to the contrary is high.

This view has also been adopted by a District Court in the Tenth Circuit[18] and by the Court of Appeals for the Ninth Cir-

---

**17.** In this case the court also pointed out that insufficient evidence had been presented for it to determine whether there had been any abuse of discretion by the contracting officer. 201 Ct.Cl. at 15, 475 F.2d at 1385.

**18.** *Fireman's Fund Insurance Co. v. United States*, 362 F.Supp. 842 (D.Kan.1973). In this case the court concluded " . . . that despite the fact that the surety informed the Government that the contractor was in financial difficulty and delinquent in a debt to a supplier, the government was under no duty to make progress payments to the surety, so long as the government took reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job." 362 F.Supp. at 848.

cuit.[19] These courts relied exclusively upon the reasoning of the cases discussed above in coming to their respective decisions that the sureties in each of the cases should not recover the amounts of progress payments made by the Government to contractors who were in financial difficulties.

The next point to be considered, before the rights and liabilities of the parties in this case can be decided, is the standard of proof necessary to show either bad faith or an arbitrary abuse of discretion. First, it must be noted that in the *Argonaut* and *USF&G–I* cases discussed above, the court did not find it necessary to define the limits of these terms because in each case the plaintiff had failed to present the high degree of proof necessary to establish that the contracting officer had acted in bad faith or abused his or her discretion. 193 Ct.Cl. at 495, 434 F.2d at 1368–69; 201 Ct.Cl. at 15, 475 F.2d at 1385. In *Royal Indemnity*, Trial Judge Wood first found that there was no question as to the Government official's good faith. 208 Ct.Cl. at 822, 529 F.2d at 1319. Then, in order to define the standard of proof necessary to show an abuse of discretion, he spoke of the high degree of proof required and relied upon cases which dealt with alleged abuses of discretion by contracting officers in the awarding of Government contracts. 208 Ct.Cl. at 823, 529 F.2d at 1319–20. Thus, in this case, in order to define the standard of proof necessary to show bad faith or an abuse of discretion, the standards enunciated in cases dealing with the analogous situation of the discretion invested with contracting officers in the process of awarding contracts must be considered.

First, with respect to a showing of bad faith, the burden of proof is a very high one indeed. In *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954), the court said "... it takes, and should take, well-nigh irrefragable proof to induce us ..." to find bad faith in the conduct of a Government official. *See*, also, *Librach v. United States*, 147 Ct.Cl. 605 (1959); and, *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). The recent case of *Morgan Business Associates, Inc. v. United States*, 223 Ct.Cl. 325, 619 F.2d 892 (1980), involved the loss or misplacement of plaintiff's bid proposal by the Government contracting officer which in turn resulted in a failure to consider the plaintiff's bid. Noting that there is a presumption against fraud by Government officials, the court said that, since there was no proof that the loss of plaintiff's bid proposal was deliberate, it could not assume any fraud or dishonesty on the part of the contracting officer. 223 Ct.Cl. at —— n.5, 619 F.2d at 895 n.5.

In this case, the plaintiff has not offered any proof of the type of deliberately fraudulent or dishonest conduct required by the decisions cited above. Indeed, plaintiff's own witnesses did not accuse the Government official, Mr. Lindon, of dishonesty. Instead, they testified to, what they perceived to be, his lack of judgment or downright stubbornness in refusing to accept their assertion that the contractor, Bard, was actually in default on its contracts with the Government. Given this failure of proof, plaintiff's allegations of bad faith by Mr. Lindon simply cannot be sustained.[20]

19. *United Bonding Insurance Co. v. Catalytic Construction Co.*, 533 F.2d 469 (9th Cir. 1976). This was a suit by subcontractors and materialmen against a surety to recover on a payment bond. The surety then sued the principal contractor as a third-party defendant. Whether or not the Government had acted properly in paying the contractor after notice of its financial difficulties was determinative of whether the surety could recover the amounts of the progress payments from the contractor.

20. This conclusion is further supported by the structuring of plaintiff's post-trial brief. The allegations of bad faith contained therein are always coupled with allegations of abuse of discretion. Plaintiff relies entirely upon the *Argonaut*, *USF&G–I*, and *Royal Indemnity* cases to support these allegations. As noted above, however, in only one of these cases, *Royal Indemnity*, was the issue of the Government's bad faith even discussed. In that case, the allegations were disregarded by the trial judge for lack of proof. Thus, no standard for

The next standard of proof which requires definition is that needed to show an abuse of discretion by a responsible Government official. The case of *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233 (1970) (*Keco–I*) involved the award of a Government contract to a competitor of the plaintiff which award was based on a lower bid proposal by the competitor and which plaintiff alleged contemplated a method of performance known to be unfeasible. The court in that case said that only if the contracting officer's award decision was an abuse of discretion could it be set aside. 192 Ct.Cl. at 782, 428 F.2d at 1238–39. The court said that, in order to be an abuse of discretion, the decision must be found to be arbitrary and capricious. This standard was met, for the purpose of avoiding dismissal under a dispositive motion, by allegations in plaintiff's complaint that the contracting officer knew or should have known at the time the bids were being considered that the competing contractor's proposed methods would not be workable. Commenting on the standard of proof required to show arbitrary and capricious action, the court said that it " . . . should be a high one . . . [with the final decision] based on the particular circumstances of each case." 192 Ct.Cl. at 784, 428 F.2d at 1240.

In its second consideration of the case, the court defined four separate factors which should be used in determining if conduct by a Government official is arbitrary and capricious. *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974) (*Keco–II*). These are: (1) that there is evidence of subjective bad faith on the part of the Government official (citing) *Heyer Products Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956); (2) that there is "no reasonable basis" for the decision (citing) *Continental Business Enterprises, Inc. v. United States*, 196 Ct.Cl. 627, 637–38, 452 F.2d 1016, 1021 (1971); (3) that the degree of proof necessary is related to the amount of discretion given to the Government official, *i.e.*, the greater the discretion granted, the more difficult it will be to prove the decision was arbitrary and capricious (citing) *Continental Business, supra*; and, (4) that a proven violation of an applicable statute or regulation may be enough to show that the conduct was arbitrary and capricious (citing) *Keco-I, supra*. 203 Ct.Cl. at 574, 492 F.2d at 1203–04. These considerations were recently reaffirmed by this court in *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, ——, 617 F.2d 590, 597 (1980).

The two factors which primarily relate to this case are those numbered (2) and (3) above.[21] The third factor, that the degree of proof necessary to prove arbitrary and capricious conduct is related to the amount of discretion given to the Government official, is most easily considered first. All three prior cases which have dealt with a factual situation similar to this one have stressed that the contracting officer's discretion in deciding whether or not to withhold a progress payment is very broad. *Argonaut, supra*, 193 Ct.Cl. at 493, 434 F.2d at 1367–68; *USF&G–I, supra*, 201 Ct.Cl. at 14, 529 F.2d at 1384; *Royal Indemnity, supra*, 208 Ct.Cl. at 823, 529 F.2d at 1320. Under these cases it is clear that the plaintiff here has a considerable burden to overcome in proving that the contracting officer arbi-

determining what constitutes bad faith was established in that case. Confronted with such lack of support, it does not appear that plaintiff can seriously contend that the contracting officer in this case acted dishonestly or in bad faith.

**21.** The first factor listed by the court in *Keco-II* seems to suggest a meshing of the concepts of bad faith and arbitrary and capricious abuse of discretion. This is further evidenced in the *Burroughs Corp.* case where the court said: "Not far removed from the bad faith test is the second factor, proof that there was 'no reason-

able basis' for the administrative decision. Action by the Government which has no reasonable basis . . . is often equated with conduct motivated by subjective bad faith." 223 Ct.Cl. at ——, 617 F.2d at 597. The distinction, or lack thereof, between these two concepts is not important here, since the court did not hold that a finding of bad faith was *necessary* to constitute arbitrary and capricious conduct. Also, the fourth factor is not relevant here, since the plaintiff in this case has not alleged violation of a statute or regulation.

trarily and capriciously abused his discretion by refusing to withhold the progress payment.

Keeping in mind that the burden on plaintiff is very high, the second factor enunciated by the court in *Keco-II* must be addressed, i.e., is there *any* reasonable basis for Mr. Lindon's decision not to withhold the sixth progress payments from Bard Construction.[22] The facts as developed by this record show that Mr. Lindon's decision was not without some reasonable basis, and therefore was not an arbitrary and capricious abuse of his discretion.

■ The prior cases which have dealt with similar factual situations have stressed that the paramount interest of the Government, while a contract is still in the performance stages, is the satisfactory completion of that contract. *Argonaut, supra,* 193 Ct.Cl. at 492–93, 434 F.2d at 1366–67; *USF&G–I, supra,* 201 Ct.Cl. at 14, 475 F.2d at 1384; *Royal Indemnity, supra,* 208 Ct.Cl. at 822, 529 F.2d at 1319. In considering this question, the court has looked to three factors which, it feels, indicate that the decision of the contracting officer not to withhold a progress payment was a reasonable one. These are: (1) that satisfactory progress was being made in the performance of the contract; (2) that the contracting officer had received some assurance that the progress payment would be used to pay the costs of performance; and, (3) that

there was some evidence that the contract could not be completed as quickly or cheaply by a successor contractor. *Argonaut, supra,* 193 Ct.Cl. at 495–96, 434 F.2d at 1369; *USF&G–I, supra,* 201 Ct.Cl. at 14–15, 475 F.2d at 1385; *Royal Indemnity, supra,* 208 Ct.Cl. at 825–26, 529 F.2d at 1321.

■ In this case, both contracts had been progressing satisfactorily and on schedule. As of December 31, 1976, the date on which Bard's request for the sixth progress payments was submitted, 92 percent of the work on the aid station contract and 94 percent of the work on the paving contract had been completed.[23] Bard Construction continued to work on both contracts up to the date the sixth progress payments were received.[24] In addition, Mr. Lindon had known Mr. Bard personally for over ten years. Bard Construction had successfully completed six construction contracts at the Anniston Army Depot. In light of these facts and without the benefit of hindsight, it cannot be said that Mr. Lindon's decision to accept Mr. Bard's assurances that, if his company received the sixth progress payments and the requested extensions, it could complete the contracts was without a reasonable basis.

Finally, in making his decision not to withhold the progress payments from Bard, Mr. Lindon relied upon a procurement regulation [25] which he interpreted to prohibit the withholding of progress payments for the

22. This standard can be contrasted with that required by the Government procurement regulations which allow a contracting officer to withhold progress payments from a financially troubled contractor. Those regulations require "substantial evidence" of financial incapacity on the part of the contractor. 32 CFR Vol. III § E–524 (1976); *see National Eastern Corp. v. United States,* 201 Ct.Cl. 776, 795, 477 F.2d 1347, 1358 (1973). The question in the present case is not, however, whether the contracting officer had the discretion to withhold the progress payment from Bard. Rather, the primary issue to be decided is whether it was an abuse of his discretion not to withhold the progress payment.

23. While it is true that on December 30, 1976, Bard did submit requests for 30-day extensions on both contracts, there is no evidence that the Government had any indication these requests

were motivated by other than valid and excusable reasons for contract delays. Both extensions were approved (although one was shortened to 19 days) after investigation and verification by contracting office personnel that the extensions were warranted under the circumstances.

24. Bard's failure to continue work on the contracts after receiving the sixth progress payments may indicate lack of good faith on the part of Mr. Bard in making the assurances that he did to Mr. Lindon. However, this does not indicate any impropriety on the part of the contracting officer, since there is no evidence to show that the Government had any prior notice that Bard would cease work after receiving the payment.

25. *See* footnote 9, *supra.*

sole reason that a contractor was delinquent in paying subcontractors and materialmen. Although his interpretation of this regulation is open to question,[26] it is at least reasonable upon the face of the regulation.

■ Thus, in this case, it cannot be said that the Government contracting officer refused to withhold the sixth progress payments without a reasonable basis. Therefore, under the law as stated by this court in the *Argonaut, USF&G–I,* and *Royal Indemnity* cases, the plaintiff is not entitled to recover.[27]

### CONCLUSION OF LAW

Upon the findings of fact and this opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

NICHOLS, Judge, concurring in the result:

In modern judicial writing, footnotes often contain the most important material the writer has to offer. The smaller the print, the more care required of one's perusal. It is certainly so in this case, although the court has seen fit to revise Trial Judge Fletcher's footnote 27. Its full unrevised text is as follows:

> Although on the record in this case it cannot be said that actions of the Government contracting officer, Mr. Lindon, had no reasonable basis, a strong argument can be made that his actions with respect to USF&G were at least negligent. USF&G officials gave the Government ample notice of Bard's financial difficulties. As early as December 23, 1976, Mr. Lindon received notice from the surety

that it was fearful of incurring liability on Bard's payment and performance bonds for the Anniston contracts. Again on January 3, 1977, letters signed by Mr. Bard directing that future contract payments be made directly to the surety were received. Mr. Lindon testified that he failed to see those letters, which had been placed in the contract file while he was on vacation, when he reviewed the file in preparation for a meeting with the surety on January 10, 1977. This, if true, shows carelessness on his part. Again, in the January 10 meeting Mr. Lindon was shown further documentary evidence of Bard's financial troubles (although he denies this). In addition, at this time, the Government had received notice and Lindon was aware of an outstanding bill of over $10,000 from one of the subcontractors on the aid station project. Mr. Lindon's admitted failure to make any further investigation into the financial situation of Bard Construction in the face of this evidence indicates negligent conduct on his part. (Cf. *Fireman's Fund Insurance, supra,* in which a District Court faced with a similar factual situation said: "... the Government was under no duty to make progress payments to the surety, so long as the Government took reasonable steps to determine for itself that the contractor had the *capacity and intention* to complete the job." 362 F.Supp. at 848 (emphasis supplied).) Certainly, the representatives of USF&G involved in this case had done everything they possibly could to give the Government notice of Bard's financial situation and to prevent the progress payments from being made to what they correctly perceived to be a failing construction company. The Government contracting

---

26. *See* footnote 22, *supra.*

27. The Government's contracting officer, Mr. Lindon, may have been negligent in failing to see in the file (before the meeting on January 10, 1977) Mr. Bard's "direction to pay" letters to defendant, directing that future contract payments be made directly to the surety. This failure, however, did not contribute to Lindon's later giving the sixth progress payment to

Bard, a decision which was based on the contracting officer's reasonable interpretation of the procurement regulation, his subsequent inquiry of Bard, and Lindon's discussions with plaintiff's representatives. Nor do we consider that, in the circumstances, Lindon was negligent, or failed in his duty to plaintiff, in not making any further inquiry or investigation into Bard's financial situation.

officer's conduct in this case, while it does not rise to the level of bad faith or arbitrary and capricious abuse of discretion which is required to prove liability, clearly shows a lack of prudence and responsibility on the part of the Government official involved.

I suppose the able trial judge felt that these observations ought to receive the notice of the court, but was unable to decide whether they should be in the recommended opinion or in the findings and so decided on a position that would invite more attention than either.

As defendant argues, although in our precedent decisions we have always given lip service to a notion that the contracting officer has some kind of a duty in making progress payments to exercise discretion to protect the surety against needless loss, the extent of this duty has never been spelled out, nor has an example of a breach of it been furnished. If such alleged duty ever was more than a mere chimaera, it has become such by reason of the ASPR provision quoted in footnote 9. Negligence is nothing if not a breach of duty owed in some identifiable direction. If the contracting officer owed no duty to the surety, he was not negligent as unrevised footnote 27 says he was. I believe this is a correct exposition of the present law and I concur in the result on the basis of this belief.

Certainly if there was a duty, Mr. Lindon, the contracting officer, breached it. He could never have entertained any serious intent to protect the surety, if he did take a few ritual measures to protect his own posterior. He knew, or was on notice that, Mr. Bard had signed letters directing that all monies due on the Bard contracts be paid to USF&G, assigning monies due to a trust for benefit of creditors, and saying that due to the outstanding bills, Bard Construction was in default. A meeting between the contracting officer and USF&G representatives took place on January 10, 1977. A comparison between the trial judge's footnote 8 to the proposed opinion, and finding 24(a) reveals that Mr. Lindon falsely denied that he was given copies of these letters on

January 10. By finding 24(d) he said that the ASPR Regulation precluded his doing anything with the progress payment except paying it to Bard. It appears as in *USF&G v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973) (USF&G I) the contracting officer really denied he had or would exercise the discretion this court said he had. See my concurrence, 201 Ct.Cl. at 17, 475 F.2d at 1386.

It became obvious Mr. Bard now no longer wanted done with the payment what his previous letters had said he wanted done.. Mr. Lindon never asked him what had happened to bring about the change of position, or why performance in full now could be promised when the previous week it had been in jeopardy. Defendant surmises, plausibly to my mind, that Mr. Bard signed the letters he had signed, hoping that USF&G would fund the completion of his contracts but now he had learned they would not, his paramount object was to get his hands on the progress payment himself. He did, and work by his subcontractors stopped immediately and for good. Anyone with the inherent skepticism of a schoolboy of 10 would have seen that this was the probable outcome of giving him the progress payment unencumbered. Lindon asked a few ritual questions of Mr. Bard, but carefully avoided any searching ones that might have developed why Bard had changed completely around and now wanted to freeze USF&G (and, therefore, the unpaid subcontractors) out of the progress payment.

In the circumstances, I cannot accept as sufficient precaution asking a few leading questions of Mr. Bard, but not asking the ones that would be obvious to one who seriously intended to exercise discretion in a responsible way.

I think it is time for the court to come out from behind the bushes and either agree with Mr. Lindon, and with government counsel herein, that the contracting officer has no duty to exercise discretion in the premises, or else to require of the contracting officer a standard of care reasonably calculated to be of some use in limiting

the losses these unhappy business failures by construction contractors always cause. As things are, we get the worst of both alternatives. We invite litigation in every case by giving the surety who has borne the loss an illusory gleam of light, yet we don't fool anybody. I am sure that since USF&G I, no surety company has mitigated its fees for Miller Act coverage a single dollar because of any hope this or any other court will render it any aid in the circumstances here attendant.