**Gordon R. ENGLAND, Secretary of the Navy, Appellant,**

v.

**SYSTEMS MANAGEMENT AMERICAN CORPORATION, Appellee.**

No. 01–1179.

United States Court of Appeals, Federal Circuit.

DECIDED: June 19, 2002.

Before MICHEL, Circuit Judge, PLAGER, Senior Circuit Judge, and RADER, Circuit Judge.

MICHEL, Circuit Judge.

The Secretary of the Navy appeals from a decision by the Armed Services Board of Contract Appeals holding the Navy liable for breach of a contractual duty to negotiate in good faith and to thereby approve by a certain date the option contracts that the Navy had otherwise negotiated with the appellee, Systems Management American Corporation ("SMA"). *Appeals of Systems Mgmt. Am. Corp.*, 2000 WL 1372837 (A.S.B.C.A. Sept. 19, 2000). As a result, the Board concluded, the Navy owed SMA approximately $31,000 for costs incurred in the preparation and negotiation of the parties' unapproved options. Because the Navy official charged with approving the parties' options—an Assistant Secretary of the Navy—had reasonable grounds to delay his approval, and because (as the Board itself found) he did not act in bad faith, we conclude that the Secretary did not act arbitrarily and capriciously in not immediately approving these options. Accordingly, we hold that the Board erred in concluding that he did and *reverse* and *remand* with instructions to enter judgment for the Secretary.

I

This dispute arose out of the Navy's "SNAP II" program, a program started in the 1980s to update non-tactical computer systems for the Navy's surface ships and submarines. The program required four contracts, all of which the Navy awarded to contractors who qualified under Section

8(a) of the Small Business Act ("SBA") as small businesses owned and controlled by "socially and economically disadvantaged individuals." *See generally* 15 U.S.C. §§ 631(a), (d), (j), 697c (declaring Congress' policy of encouraging aid to small businesses through the assistance of the Small Business Administration and encouraging federal agencies to "foster[ ] the participation of small business concerns in the contracting opportunities of the Government"). As it turned out, SMA received the award for all four of these contracts.

In April 1987, SMA received its fourth SNAP II contract award, Contract No. N00039–87–C–0173, and entered into a letter contract with the Navy for a basic quantity (or "base year" amount) of computer systems and system upgrades. In addition, the parties agreed that SMA would provide another 333 systems and upgrades if the Navy chose to exercise certain options in fiscal years 1988—1991. The parties made this letter agreement subject to "definitization" by September 30, 1987, meaning they had to set the prices for both the base- and option-year equipment by that date.

On September 22, 1987 or so, as the parties were still negotiating the terms of their agreement, SMA learned that under SBA policy it had to definitize the prices for all its agreements, including its options, no later than October 21, 1987. This was so because SMA was graduating from the SBA's Section 8(a) program on that date and, under SBA policy, SMA could not perform the options (provided the Navy exercised them in the first place) if it had not definitized its prices before graduation. Both SMA and the Navy's contracting officer agreed that they could avoid any difficulties arising from this SBA deadline by setting the option prices at ceiling amounts subject to downward-only adjustments for overhead and other costs. Later, on Sep-

tember 30, 1987, the Navy and SMA agreed to Modification No. PZ0003, an agreement that definitized the prices for the base-year computer systems and replaced the letter contract as the document governing the parties' relationship. Also, under this modification, the contracting officer and SMA further agreed to definitize the prices for the options no later than October 21, 1987.

In early October 1987, the contracting officer and SMA agreed upon the prices for the option-year computer systems as well, setting the contract's total dollar ceiling amount at $101,557,993. The parties prepared a second contract modification incorporating these terms; but because this modification's total dollar ceiling amount now exceeded the contracting officer's authority, the parties needed to have the Assistant Secretary of the Navy (Logistics and Shipbuilding) approve the modification.

On October 16, 1987, however, the United States Attorney for the Eastern District of Virginia issued a press release stating that a former SMA employee had pled guilty in federal court to charges of conspiring to defraud the government in a kickback scheme involving "senior officials of SMA" and purchase orders charged to a contract with the Navy. Further, the U.S. Attorney indicated that its investigation was ongoing. As a result, on October 20, 1987, the Assistant Secretary of the Navy delayed approval of the subject agreement, citing the "current [criminal] investigations regarding SMA" and the business concern that a contractor (like SMA) should have had its options "fully priced from the outset." The Assistant Secretary later testified that, at minimum, he needed more information about the criminal investigation before approving the prepared modification—action that the Assistant Secretary considered "prudent" and "absolutely es-

sential" to the exercise of his responsibilities.

The October 21 deadline set by the SBA thus passed without the Assistant Secretary's approval, thereby rendering SMA ineligible to perform the options even if the Navy had chosen to exercise them. On November 2, 1987, after meeting with SMA's lawyers, the U.S. Attorney wrote to the Assistant Secretary indicating that he "was not in a position" to assess SMA's criminal liability or the liability of its officers. Upon receiving this letter, the Assistant Secretary notified SMA on November 5, 1987, that the "events which had occurred in the Eastern District of Virginia—Norfolk Division [*i.e.*, the recent conviction of SMA's employee] would not affect SMA's further participation in the SNAP II program." The Assistant Secretary also testified that the letter he received from the U.S. Attorney "had erased" any concerns he had about SMA and that he was willing on that date to approve the options.

Nevertheless, because of SMA's ineligibility under the Small Business Act, the Navy had to eliminate the options from the parties' contract (Contract No. 0173) and re-solicit offers to have the remaining SNAP II requirements performed. SMA submitted an offer but the Navy ultimately awarded the project to another contractor. (Interestingly, in July 1991, SMA pled guilty to one count of conspiring to defraud the Navy for actions relating to the first two SNAP II contracts, not the fourth contract. In all, five SMA employees, including two senior vice presidents, also pled guilty to multiple counts involving fraud as it related to those two contracts.)

Meanwhile, SMA eventually completed performance of the 1987 base-year requirements agreement (Contract No. 0173) that it did have with the Navy. Later, however, in 1991 and again in 1994, it filed claims with the contracting officer for an equitable adjustment and for breach damages, arguing as to the latter that the Navy had failed to timely approve the options and then failed to exercise them. The contracting officer eventually denied the equitable-adjustment and breach claims, prompting SMA to seek recourse in the Armed Services Board of Contract Appeals.

## II

In a split decision, the Board upheld the denial of the equitable adjustment claim but partially sustained SMA's appeal of the breach claim. Specifically, after a hearing, the Board found that while the Navy had no obligation to exercise the options it had with SMA, the Assistant Secretary nevertheless failed to act reasonably in delaying approval of the otherwise definitized options. As the Board saw it, the parties' September 1987 agreement to definitize the options by the October 21 deadline constituted an agreement to negotiate in good faith. Further, while the Board found that the Assistant Secretary was not motivated by "bad faith," it concluded that his two stated grounds for delaying approval lacked any "reasonable basis" and were "arbitrary and unreasonable."

As to the stated concern about the recent criminal conviction, according to the Board, the Assistant Secretary still could have approved the options without harming the government's interests; the Navy could have simply chosen not to exercise the options at all. As to the stated concern about having the options "fully priced," authorized representatives of the Navy had already agreed to ceiling prices subject to a downward-only adjustment; and thus, the parties had indeed timely definitized the option prices within the meaning of the parties' September 1987

agreement. The Board concluded that the Navy's breach of the duty to negotiate in good faith caused SMA to incur negotiation and preparation costs of $31,025 plus interest.

Two of the Board's five judges dissented. In so doing, they agreed with the Board that the parties essentially had an agreement to negotiate in good faith and that the issue turned on whether the Navy here had failed to negotiate accordingly. But they disagreed that the Navy in general and the Assistant Secretary in particular had acted arbitrarily and capriciously or otherwise in bad faith by delaying approval of the options. The delay covered a short period of time (15 days), they reasoned. And the Assistant Secretary could have and indeed probably should have delayed any final decision pending the receipt of additional information about the "serious criminal issues" surrounding SMA's employee and SMA's contracts with the Navy. Further, in the dissenting judges' view, the Navy should not have to pay for SMA's failure to meet the deadline set by the Small Business Administration's policy:

> Why the Navy should bear the responsibility attendant to such revelation [about possible criminal activity involving SMA] escapes us. Appellant [SMA] and its employees engaged in criminal conduct under the very program now before us and must bear the natural and reasonable consequences that resulted from a revelation of such conduct. It was not the Navy's deadline that SMA was rushing to beat, it was SBA's. It was not the Navy that was graduating from the [SBA section] 8(a) program, it was SMA. It was not the Navy who engaged in criminal conduct, it was SMA. In the end, the [Assistant Secretary] was willing to approve the definitization [*i.e.,* the options] but SBA would not allow SMA to receive the options. * * *

The majority has merely expressed its view that it would have made a different decision than the [Assistant Secretary] as to the best interest of the Government given the circumstances. That is all well and good but this Board was not charged with making the [Assistant Secretary's] decision at the time, is not charged with making it retroactively now, and our authority goes only to an examination as to whether the decision was arbitrary and capricious or taken in bad faith.

(J.A. 56.) In a similar vein, the dissent asserted that the majority had essentially credited the Navy's contracting officer with the power to circumscribe the discretion of the Assistant Secretary himself, as the latter now had little choice but to approve the agreement. In so doing, the dissent continued, the majority had erroneously reduced the discretion of the Assistant Secretary "to little more than a ministerial clerk, bound to sign the definitization modification without regard to any delay he felt was necessary to secure additional information and virtually powerless to arrive at any decision but to sign, regardless of any *bona fide* questions he had." (J.A. 55.)

This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(10) (1994) and now reverse.

### III

In short, we agree with the position taken by the Board's dissenting judges as well as the Secretary that the Navy had a reasonable basis for briefly delaying approval of the parties' definitized options. Under the Contract Disputes Act, 41 U.S.C. § 609, we review the Board's factual findings to see whether substantial evidence supports them or to see whether the Board rendered them in bad faith. *Avia-*

*tion Contractor Employees, Inc. v. United States,* 945 F.2d 1568, 1571 (Fed.Cir.1991). We review the Board's conclusions of law, however, without deference. *Arnold M. Diamond, Inc. v. Dalton,* 25 F.3d 1006, 1010 (Fed.Cir.1994); *Aviation Contractor Employees,* 945 F.2d at 1571.

## A

Moreover, as explained by our predecessor court, courts (including the Board) ordinarily review a discretionary action taken by a government official only to see whether that action amounts to an abuse of discretion or is otherwise arbitrary and capricious. *United States Fidelity & Guaranty Co. v. United States,* 230 Ct.Cl. 355, 676 F.2d 622, 628, 630 (1982); *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (1974). In so doing, courts have articulated four separate factors to consider: (1) whether the government official acted with "subjective bad faith," keeping in mind the "well-nigh irrefragable proof" needed to overcome the presumption that a government official performs his duties in good faith, *i.e.,* to establish that this official acted in bad faith, *United States Fidelity & Guaranty Co.,* 676 F.2d at 629–30; (2) whether the official had "no reasonable basis" supporting the decision at issue, a factor closely associated with the bad-faith test stated above, *Keco Indus.,* 492 F.2d at 1203–04; (3) the amount of discretion vested in the government official who rendered the decision under scrutiny, *United States Fidelity & Guaranty Co.,* 676 F.2d at 630, coupled with consideration of the quantum of proof showing the alleged wrongdoing at issue, *Keco Indus.,* 492 F.2d at 1204; and (4) whether a proven violation of the relevant statutes or regulations can alone render a decision arbitrary and capricious and thus provide a basis for recovery, *United States Fidelity & Guaranty Co.,* 676 F.2d at 630; *Keco Indus.,* 492 F.2d at 1204. As also indicated by our predecessor court, the first factor (bad faith), second factor ("no reasonable basis") or fourth factor (proven violation of statute or regulation) can each separately provide a basis for relief. *See, e.g., Keco Indus.,* 492 F.2d at 1203–04.

In this case, we need only focus on the "no reasonable basis" factor, the second factor listed above. As to the other factors, the Board expressly found no "bad faith" by the Assistant Secretary, and Appellee SMA has not even filed a brief on appeal, much less explained why the Board erred in this regard. Nor of course has either SMA or the Board discussed the third factor concerning the quantum of proof showing the alleged wrongdoing or the fourth factor concerning a proven violation of a statute or regulation.

Left with only the second factor, we believe the Board erred by concluding that the Assistant Secretary abused his considerable discretion and had "no reasonable basis" to support the decision to delay approval of SMA's definitized options. Simply put, we believe the Assistant Secretary could have reasonably deemed it in the best interests of his agency to secure additional information about a current criminal investigation involving both SMA and the SNAP II program itself before approving these options. Indeed, we agree that had the Assistant Secretary acted otherwise, one might reasonably characterize his prompt approval of the parties' agreement as "derelict" or else unreasonable. After all, upon learning of the U.S. Attorney's investigation, the Assistant Secretary could have reasonably suspected that the criminal activity involving SMA and the SNAP II program may have infected the parties' "entire course of dealing," a suspicion borne out (at least in part) by the guilty pleas that high-ranking officers of SMA and SMA itself later en-

tered for conspiring to defraud the government as to its first two SNAP II contracts. *See generally Brown Constr. Trades, Inc. v. United States*, 23 Cl.Ct. 214, 216–17 (1991) (granting summary judgment for the government on claims for payment brought by a contractor due to the contract's unenforceability when the contractor was convicted for fraud and bribery for actions relating to part (if not all) of that contract; "[t]he practice of a fraud on part of a contract condemns the whole").

It goes without saying, meanwhile, that the Navy had no obligation to approve an expanded contractual relationship with a contractor engaged in criminal conduct, even if the Navy did retain the right never to exercise the options in the first place. *Cf. id.* at 215 ("The case law uniformly states that public policy considerations, in particular concern for the integrity of the Government procurement process, preclude the enforcement of contracts tainted by bribery, kickbacks or conflicts of interest.") (citations omitted). And, as the Secretary argues, if the Assistant Secretary simply approved the proposed modification without further inquiry, he may have risked waiving any argument the Navy may have had about civil claims or defenses relating to SMA's fraudulent or criminal conduct. In other words, having learned of SMA's ties to a conspiracy of unknown proportions, the Assistant Secretary could not have necessarily approved the options and then later asserted in litigation that the fraud or other criminal activity either rendered these options unenforceable or else supplied the Navy with a cause of action sounding in fraud under, *e.g.,* the False Claims Act; his notice of the fraud or other criminal activity along with his subsequent approval of the options could have at least arguably amounted to a waiver of these claims or defenses. *See, e.g., Ab–Tech Constr., Inc. v. United States*, 31 Fed.Cl. 429, 431 (1994) (discussing argu-

ment, later rejected by the court, that the "Government's election to proceed with the contract in the face of full knowledge of the facts precluded it, as a matter of law, from maintaining any action [under the False Claims Act] grounded on allegations of contractor fraud").

Last, as compared to the precedents cited for our review, the Assistant Secretary's stated rationale fits comfortably within the bounds of "reasonableness" as used in the context of reviewing discretionary action taken by a government official. In *Keco Industries*, for example, our predecessor court rejected an unsuccessful bidder's attempt to recover bid-preparation expenses based on government officials' failure to realize that the winning bidder's proposal actually involved "costly changes." 492 F.2d at 1206. The court explained that even assuming the government's negligence in this regard, the relevant officials had also reasonably believed that the winning bidder's proposal would work without incurring such costs. *Id.* Mere negligence could not render the government's decision arbitrary and capricious, the court concluded. *Id.*

In this case, we do not even discern negligence on the Assistant Secretary's behalf; to the contrary, given the circumstances, *i.e.,* the possibility that the criminal conspiracy had also spread to the fourth of SMA's SNAP II contracts, we believe the Assistant Secretary did indeed act prudently by delaying approval of the options. *See id.; cf. United States Fidelity & Guaranty*, 676 F.2d at 631–32 (contracting officer had "reasonable basis" for deciding not to withhold payments to a contractor when that contractor had performed more than 90% of the two contracts at issue, had worked on and successfully performed other contracts with this contracting officer in the past and the contracting officer had reasonably inter-

preted a payment regulation even if the correctness of that interpretation was still "open to question"). We thus conclude that the Assistant Secretary had a reasonable basis for delaying approval of SMA's options, even if doing so happened to mean that, under SBA policy, SMA could no longer perform these options.

## B

The "good faith" precedents cited by the Board do not convince us otherwise. "Good faith" ordinarily refers to " 'that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, ... faithful[ness] to one's duty or obligation.' " *Arnold M. Diamond, Inc.*, 25 F.3d at 1010 (quoting *People v. Nunn*, 46 Cal.2d 460, 296 P.2d 813, 188 (1956) and discussing "good faith" as used in the Contract Disputes Act). We agree with the Board that the September 1987 agreement that the parties had formed to definitize the options by the SBA deadline constituted an agreement to negotiate in good faith. *See, e.g., Aviation Contractor Employees*, 945 F.2d at 1572 (explaining that an agreement to specify certain terms via future negotiation creates a binding obligation to negotiate in good faith); *City of Tacoma v. United States*, 31 F.3d 1130, 1132 (Fed.Cir.1994) (stating "that a contract term which allows for future negotiation 'impliedly places an obligation on the parties to negotiate in good faith' ") (citation omitted). As stated above, however, the Board itself expressly found that the Assistant Secretary did not act in "bad faith" by delaying his approval of the definitized options.

Further, to the extent an agreement to negotiate in good faith could actually require something more than simply not negotiating in bad faith, we see no valid reason to hold the Assistant Secretary in breach of that agreement. After all, un-

like the situation where the government's unwillingness to "negotiate at all" may constitute a "clear" breach of a good-faith duty, *see, e.g., Aviation Contractor Employees*, 945 F.2d at 1572, the Assistant Secretary had a valid reason for not simply rubber-stamping the definitized options by the SBA deadline: the recent conviction of an SMA employee for conspiracy to defraud the Navy, the ongoing criminal investigation and the concern that the conspiracy may have infected the very same agreement that SMA was now asking the Assistant Secretary to approve. Case law correctly suggests that a government official does not breach a duty to negotiate in good faith when, as in this case, that official changes his initial negotiating stance due to the "discovery of error" or some other intervening circumstance. *See Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 342 (1983) (rejecting contention that agency representatives "did not negotiate in good faith"; "[t]o change an initial negotiation stance after discovery of error is neither an unusual occurrence in public administration nor improper"). The discovery of possible criminal activity by SMA justified the putative change that the Navy generally and the Assistant Secretary specifically took in their "negotiating stance" with SMA and further justified the decision to briefly delay approval of the definitized options.

## IV

For the reasons stated above, we reverse the decision of the Armed Services Board of Contract Appeals and hold that the Assistant Secretary of the Navy neither lacked a reasonable basis for his decision to delay approval of the definitized options under Contract No. N00039–87–C–0173 nor breached a duty to negotiate in good faith. Because our resolution of this issue sufficiently resolves this appeal, we need not address the other issue raised by

the Secretary about the contracting officer's lack of authority to limit the discretion of the Assistant Secretary.