**James L. MURPHY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 128-80C.

United States Claims Court.

March 2, 1989.

**386**

Guy J. Ferrante, Falls Church, Va., for plaintiff.

John S. Groat, Dept. of Justice, Washington, D.C., for defendant, with whom was George M. Beasley, III, for defendant. Lt. Col. Guy J. Sternal, United States Air Force, of counsel.

## OPINION

ROBINSON, Judge.

This case involves a suit by a retired Air Force Reserve Officer pursuant to 28 U.S.C. § 1491, *et seq.*, as amended, seeking reinstatement, back pay, correction of military records, and other relief. The matter is before the court on cross-motions for summary judgment filed by the parties. The plaintiff's motion for summary judgment will be denied in part and granted in part. The defendant's motion for summary judgment will also be denied in part and granted in part. The court's reasoning in reaching its conclusions on these motions follows.

## FACTS

Plaintiff began his military service as a second lieutenant on active duty in the Air Force Reserves on August 29, 1959. He served until August 27, 1962, when he was voluntarily released due to "personal hardship and the desire to study for a Master's degree." No Officer Effectiveness Report (OER), a report rating performance and potential, was prepared at the time of that release from active duty. Thus, plaintiff's personnel records fail to contain any reference to plaintiff's performance for the period from January 6 through August 27, 1962.

On November 17, 1962, plaintiff was appointed a first lieutenant in the Indiana Air National Guard (ANG) and remained in that capacity without interruption until July 17, 1967, when he returned to active duty in the Air Force Reserves. His personnel records covering his ANG service contain no OERs for the periods May 1 to November 9, 1963; August 1, 1966, to January 22, 1967; and January 23 to June 29, 1967.

Plaintiff served on active duty from January 2 to May 7, 1969, at Scott AFB, Illinois. His OER for that period reflected an overall rating of 7–2, Very Fine.[1] He attained the grade of permanent major, effective February 1, 1971. He then served on active duty as Chief, Office of Information, 62d Military Airlift Wing (MAW), Military Airlift Command (MAC), McChord AFB, Washington, from June 1971 to January 28, 1973. No OER is in plaintiff's personnel records for the period June 17, 1972, through January 29, 1973. He was next

---

**1.** The first number indicates an overall evaluation. A "9" is the highest possible rating and indicates an evaluation of "outstanding." The second number represents the ratee's promotion potential. A "4," the highest rating, indicates that the ratee has "outstanding growth potential based on demonstrated performance. Promote well ahead of contemporaries." In addition to these numerical ratings, the reporting official (the primary rater) completes nine rating factors, such as "knowledge of duties" and "leadership characteristics," and provides narrative comments.

assigned on a temporary duty basis (TDY) for 325 days as a graduate student at San Diego State University. His personnel records contain a Training Report, which covers these two periods, or from June 17, 1972, through January 9, 1974. AFM 213–1, paragraph 4–2, the regulation establishing the TDY program, provided that the permissible periods of study could range only "from a summer session to one year." However, the training report covered 19 months—seven months more than the maximum allowable time for an approximately 47–week study course.

Plaintiff returned after his TDY ended on January 9, 1974, to his former assignment at McChord AFB. On January 10, 1974, plaintiff signed AF Form 2095 which informed him that his OER rating official would be the Commander, 62d MAW, and his indorsing official would be the Commander, 22d Air Force, MAC, the officials who submitted his previous OER. A subsequent AF Form 2095, dated March 12, 1974, purported to change his rater to Vice Commander, 62d MAW, retroactive to January 18, 1974. Plaintiff was never informed of this change in his reporting official. He conducted himself accordingly with only sporadic and infrequent contact with the Vice Commander, 62d MAW. When plaintiff received his OER for the period January 18 through May 24, 1974, reflecting an overall 7–3, Excellent, rating, the rater was the Vice Commander, 62d MAW, Colonel Donald W. Bennett and the indorser was the Commander, Brigadier General B.F. Starr, Jr.

Plaintiff, after discovering this OER in his records in June 1974, began formal efforts in December 1974 to have this OER voided by the Officer Personnel Records Review Board (OPRRB). Plaintiff's efforts culminated in a personnel letter denying without specific reasons the plaintiff's request for voidance of this OER. [See plaintiff's opposition filed June 17, 1986, App. 1 (plaintiff's statement dated June 6, 1986)].

Plaintiff served as Station Manager for the Far East Network, Okinawa, from June 1, 1974, through June 4, 1975. His OER rater was Major James Lapp and his indorser was Colonel William M. Taylor. No OER appears in plaintiff's personnel records for this period. Plaintiff has obtained letters from Brigadier General C.F. McClain and Colonel Taylor, and an OER with an explanatory letter from Major Lapp, stating plaintiff was entitled to an overall 9–4 rating for the period of his Okinawa service.

As a result of a reduction in military manpower requirements following the withdrawal of forces from Vietnam, a Reserve Officer Screening Board (ROSB), convened on November 11, 1974, to consider the plaintiff, with all other reserve officers serving on active duty in the United States Air Force in specified year groups containing surplus officer manning, for release from active duty. That board screened approximately 21,000 reserve officers. The ROSB panel, using the "whole-person" or "best qualified" concept, aligned in order of merit all officers based upon their respective qualities and potential. The plaintiff was in a non-rated, line-of-the-Air-Force, surplus grouping for Fiscal Years 1962–68. A proportionately higher number of officers were released from this group consistent with service needs and the parameters of the program. Briefing statistics on the ROSB indicate that 11.2 percent of the officers considered in this grouping were selected for release. The plaintiff was one of 23 majors separated in the first instance. His separation was effective June 27, 1975. Following his separation from active duty, the plaintiff briefly reverted to the Indiana ANG. He then was placed on inactive reserve status.

On October 29, 1975, the plaintiff, who was then unemployed, filed his first application for administrative relief with the Air Force Board for Correction of Military Records (AFBCMR or Board). The application requested voidance of the January 10–May 14, 1974 OER; correction of other alleged errors in his record, including insertion of missing OERs or letters of evaluation for 1966–67, 1972–73, 1973–74, 1974–75; and a hearing. The AFBCMR denied the plaintiff's application in its entirety by form letter dated March 29, 1976. The

letter stated without an analysis of the plaintiff's contentions and supporting evidence that the applicant had not submitted sufficient evidence to establish a showing of probable error or injustice.

The plaintiff's statement (Plaintiff's Opposition filed June 17, 1986, Appendix 1–17) contains a detailed explanation of the personal hardships which he suffered after his discharge. Due to these circumstances and the intercession of General Hairston, the plaintiff obtained a one-time waiver and was allowed to enlist as a Sergeant, E–4, in the Air Force on February 8, 1977. As a result of this enlistment, plaintiff became a "dual status" member of the Air Force—a regular enlisted person concurrently holding a reserve officer appointment. The plaintiff, after training at Fort Harrison, Indiana, and Keesler AFB, Mississippi, was assigned to Ramstein AB, Germany, in August 1977. He was promoted to staff sergeant E–5 while in Germany. He remained overseas for approximately 22 months, returning to the United States in May 1979. During his service overseas, the plaintiff diligently pursued efforts to obtain evidence which would form the basis for another application to the AFBCMR. He submitted his second formal appeal to the AFBCMR on November 22, 1979. In both 1979 and 1980, the plaintiff was passed over for promotion to the permanent rank of Lieutenant Colonel by the Reserve Officer Promotion Authority (ROPA).

After learning from the acting Executive Secretary of the AFBCMR, on or about March 15, 1980, that he might "go to court" with his claim, the plaintiff filed this suit *pro se* on March 18, 1980. However, the plaintiff continued to press his pending application before the AFBCMR by making supplemental filings on October 15, 1980, and May 7, 1981. This suit was suspended, upon defendant's unopposed motion, to permit a decision by the AFBCMR which, if favorable, could have mooted this case. However, the AFBCMR again, on May 21, 1981, denied all of the relief plaintiff sought, finding that the plaintiff had failed to demonstrate probable error or injustice. The AFBCMR's ruling specifically addressed the claimed errors and omissions in plaintiff's record and all of plaintiff's other contentions, including his non-selection for Lieutenant Colonel by ROPA. The AFBCMR's May 21, 1981 ruling, which adopted the Air Staff evaluation, found:

2. The application was for the most part, not timely filed; however, the Board, in the interest of equity and justice excuses [the plaintiff's] failure to timely file.

3. Insufficient relevant evidence has been presented to demonstrate the existence of probable error or injustice and [the Board] accepts the recommendation of the Air Staff.

The AFBCMR's ruling concluded:

12. Inasmuch as we have determined that the applicant's record was substantially accurate, we find no basis to warrant disturbance of the determinations of the two selection boards for promotion to lieutenant colonel (ROPA).

The certified copy of the Record of Proceedings, dated May 21, 1981, which was submitted as part of Administrative Record No. 1 by the parties to this court for review, includes two Examiner's Notes:

At the direction of the Acting Executive Secretary, this case was presented to the Board absent two Memoranda for Record based upon telephone calls from individuals who identified themselves as Brigadier General Van N. Backman, on 4 May 1981, and Bill Taylor, on 5 May 1981. These calls were obviously in an effort to clarify the ratings suggested; however, they were uncorroborated and were not accepted by the Board as valid evidence.

Applicant's most recent submission (7 May 1980) was not received in sufficient time—within the constraints agreed to by the Court and the applicant—for the examiner of record to fully address each item in that submission prior to the convening of the Board. A second Executive Session was required for the Board to consider and render its final decision.

However, the copy of the Record of Proceedings, dated May 21, 1981, and certified

on May 22, 1981, which was sent to the plaintiff by the Board in 1981, omits the first paragraph of the "Examiner's Notes." Plaintiff discovered the discrepancy between the records when, in preparing a third application to the AFBCMR during the course of this litigation, he requested and received from counsel then representing the defendant two copies of the Board's May 21, 1981 Record of Proceedings. The two copies that defendant's counsel provided contained the full text of the "Examiner's Notes." The AFBCMR has never explained the existence of the two very different versions of the "certified" Records of Proceedings. The discrepancy between the records exists also in the copy of Administrative Record No. 2 filed February 14, 1986.

Plaintiff sought reconsideration of the Board's May 21, 1981 denial by letter dated August 23, 1982. On March 17, 1983, the AFBCMR again denied relief, finding that the plaintiff had failed to demonstrate error or injustice. The AFBCMR adopted all of the prior findings of the May 21, 1981 decision, analyzed plaintiff's new contentions, and reaffirmed the prior negative conclusions of the two previous decisions. Specifically, the AFBCMR found:

6. ... Moreover, since the RIF Board scores were destroyed in accordance with existing policy and no benchmark records were retained, there is no way of reconstructing a facsimile of that Board because of the passage of time. In the absence of the establishment of either an error or an injustice in applicant's military record, the Board is compelled to presume that he was considered for retention on a basis which fairly portrayed his services. We find no new evidence which would warrant favorable consideration of this applicant's request.

7. Applicant's comprehensive submission and the availability of his complete record has enabled us to examine all aspects of his case without the necessity of a personal appearance. He has not demonstrated that his presence or that of witnesses is necessary to resolve any issue presented.

Plaintiff's motion to amend its petition in this proceeding pursuant to Rule 15 of the RUSCC was granted on May 9, 1984, in order to permit the plaintiff to raise an issue relating to the improper constitution of the ROSB which selected plaintiff for involuntary release. However, upon defendant's motion for partial summary judgment, the court ruled that the doctrine of laches applied to bar plaintiff from raising that one issue because of the plaintiff's unexcusable and prejudicial delay in bringing the claim. *Murphy v. United States,* No. 120–80C (Cl.Ct. Sept. 10, 1985) (opinion granting defendant's motion for partial summary judgment). Consequently, that issue is no longer before this court on the pending cross-motions for summary judgment.

## ISSUES

There are essentially two issues which are properly before this court:

1. Does the equitable doctrine of laches bar the plaintiff's claim; and, if not,

2. Was the decision of the AFBCMR, issued March 17, 1983, arbitrary, capricious, unsupported by substantial evidence, rendered in bad faith, or contrary to law.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating motions for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. Any doubt as to the existence of issues of material fact must be resolved in favor of the party opposing the motion. *Housing Corporation v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

The movant bears the burden of demonstrating the absence of any genuine issue of material fact. *Hodosh v. Block Drug Co.,* 786 F.2d 1136, 1141 (Fed.Cir.1986),

*cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). However, when the movant has supported his motion, then the opposing party has the burden of coming forward with evidence directed to specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Mere denials or conclusive statements are not sufficient. *Hodosh v. Block Drug Co.,* 786 F.2d at 1141. One must do more than simply show there is some metaphysical doubt as to the material fact. *Matsushita Elec. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In this case the record shows that there are no genuine issues of material fact in dispute, which would prevent the court from ruling upon the parties' motions for summary judgment.

## I. The Effect of 10 U.S.C. § 1162 and § 681(a) upon Disposition of this Case

During oral argument, the court requested briefing on what effect, if any, 10 U.S.C. § 1162 might have on the final disposition of this case. The plaintiff argues that the section has no bearing upon this case. Since the defendant does not contend otherwise, no analysis of the section is required. However, the defendant contends that under 10 U.S.C. § 681(a), the decision to release reserve officers from active duty is specifically committed to the discretion of the cognizant service secretaries. Thus, defendant argues that an exercise of discretion to release a reserve officer from active duty, even when apparently based upon a mistake of fact, is not subject to judicial review. The plaintiff contends that since the Secretary of the Air Force purported to separate the plaintiff from active duty pursuant to AFR 36-12, ¶ 71, the Secretary must accomplish that separation in compliance with regulatory authorities.

Section 681(a) provides:

Except as otherwise provided in this title, the Secretary concerned may at any time release a Reserve officer under his jurisdiction from active duty.

The Secretary's discretionary power of release from active duty is subject, however, to compliance with departmental regulations which, once prescribed by the Secretary, serve to limit the permissible exercise of that discretion. *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Since the Secretary purported to separate the plaintiff from active duty pursuant to AFR 36-12, ¶ 71, he was bound by the terms of his own regulations. *VanderMolen v. Stetson,* 571 F.2d 617 (D.C.Cir.1977); *Borgford v. United States,* 208 Ct.Cl. 1040 (1976). There can be no question that this court has the requisite jurisdiction to review the plaintiff's separation from active duty to ensure that it was accomplished in accordance with all governing statutes and regulations. *See Voge v. United States,* 844 F.2d 776 (Fed.Cir.1988); *Woodard v. Marsh,* 658 F.2d 989 (5th Cir.1981); *Buchanan v. United States,* 223 Ct.Cl. 291, 621 F.2d 373 (1980). In so doing, the court does not substitute its discretion for that of the Secretary, but simply determines whether authorized officials complied with departmental directives. *Brooks v. United States,* 209 Ct.Cl. 704 (1976).

In *Abruzzo v. United States,* 206 Ct.Cl. 731, 513 F.2d 608 (1975), the court found that § 681(a) granted the services the discretion to determine the "conditions and circumstances governing" a release from active duty and precluded it from judicially imposing its discretion on such substantive matters. But *Abruzzo* does not hold that discretionary separations are totally unreviewable for legal or procedural errors. The plaintiff's release, if not in conformity with prescribed procedures and regulations, does present this court with a fully justiciable issue. *See, e.g., Bray v. United States,* 207 Ct.Cl. 60, 80, 515 F.2d 1383, 1394–95 (1975); *Clackum v. United States,* 148 Ct.Cl. 404, 296 F.2d 226 (1960). In the instant case, the court is reviewing plaintiff's discharge from active duty "through the prism of a correction board." *Cohn v. United States,* 15 Cl.Ct. 778, 789 (1988). "The fact that this court has the jurisdiction to review actions of military correction

boards is not disputable." *Skinner v. United States*, 219 Ct.Cl. 322, 333, 594 F.2d 824 (1979) *citing Armstrong v. United States*, 205 Ct.Cl. 754, 761 (1974). If a correction board's action is unlawful because of "violation of statute, a regulation, or published mandatory procedure, or by the evidence as to be a gross injustice, unlawful because of clear legal or factual error, manifest abuse of discretion, or arbitrary and capricious action amounting to bad faith or fraud, and seriously prejudicial," *Skinner*, 219 Ct.Cl. at 333, 594 F.2d 824, this court may "provide an entire remedy," including back pay, restoration to office or position and correction of applicable records. 28 U.S.C. § 1491; *Skinner*, 219 Ct.Cl. at 330–331, 594 F.2d 824. Thus, the issue presented is whether the AFBCMR's decision that plaintiff's record before the ROSB was an accurate and fair portrayal of plaintiff's performance was arbitrary and capricious, or unsupported by substantial evidence.

## II. *The Laches Defense*

■ Laches is an equitable doctrine which precludes the prosecution of stale claims. The doctrine is premised on the maxim that equity aids the vigilant, rather than those who slumber on their rights. The fundamental policy underlying the application of the laches doctrine is that the doctrine encourages "speedy vindication" of rights so that "courts may arrive at safe conclusions as to the truth." *Brundage v. United States*, 205 Ct.Cl. 502, 505, 504 F.2d 1382, 1384 (1974). In short, a court analyzes the equities in each individual case to prevent injustice from being visited upon either party. *Pepper v. United States*, 8 Cl.Ct. 666, 671 (1985), *aff'd.*, 794 F.2d 1571 (Fed.Cir.1986). Laches clearly applies in military pay cases. *Deering v. United States*, 223 Ct.Cl. 342, 620 F.2d 242 (1980).

In the Claims Court, laches is an affirmative defense. Thus, the defendant must prove that (i) the plaintiff delayed unreasonably and inexcusably in pursuing his claim; and (2) the plaintiff's unreasonable and inexcusable delay has resulted in actual prejudice to the defendant. *Cornetta v.*

*United States*, 851 F.2d 1372 (Fed.Cir. 1988).

The laches period may begin, and toll, "apart from and irrespective of" the statute of limitations for the cause of action. *Brundage*, 205 Ct.Cl. at 506, 504 F.2d at 1384. If plaintiff has notice of a cause of action, even before the accrual of the claim for statute of limitations purposes, the laches period may begin to run. *Pepper*, 8 Cl.Ct. at 673, *citing Adkins v. United States*, 228 Ct.Cl. 909 (1981). Thus, the focus of attention is on whether, under the totality of the circumstances, there is a valid reason or a rational explanation for any of plaintiff's delay or inactivity. *See Jones v. United States*, 6 Cl.Ct. 531, 533 (1984).

However, the court tempers its application of laches so that it does not discourage plaintiff's resort to permissive administrative remedies before filing suit. A contrary policy of applying laches to the period during which administrative remedies are being exhausted would penalize a plaintiff's reasonable and prompt good faith pursuit of permissive administrative remedies. *Cason v. United States*, 200 Ct.Cl. 424, 471 F.2d 1225 (1973); *Park v. United States*, 10 Cl.Ct. 790 (1986). Courts encourage the use of administrative remedies because they are less costly to both parties and more expeditious than litigation. Moreover, administrative remedies allow the military service involved the opportunity to correct its own mistakes. *Cason*, 200 Ct.Cl. 424, 471 F.2d 1225 (1973).

Further, this court will not challenge a military review board's decision to entertain a claim once the board has accepted the appeal. *Riley v. United States*, 221 Ct.Cl. 308, 315, 608 F.2d 441, 444 (1979). Thus, once an administrative board accepts an appeal, albeit untimely, and rules on the contested issues, any subsequent timely appeal of the board's action cannot be subject to the defense of laches. *Muse v. United States*, 13 Cl.Ct. 372 (1987); *Braddock v. United States*, 9 Cl.Ct. 463 (1986); *Riley*, 221 Ct.Cl. 308, 608 F.2d 441 (1979); *Pepper*, 794 F.2d 1571 (1986). Defendant contends that laches bars plaintiff's claim in

its entirety. Defendant argues that plaintiff delayed over 13 years from the earliest omission of an OER from his record before seeking any administrative relief. In addition, defendant claims that plaintiff delayed 42 months before seeking reconsideration of the first denial of relief by the AFBCMR and 48 months before filing suit. Defendant contends that the sheer length of plaintiff's delay establishes lack of diligence, outweighing any concern that the application of laches in this case would discourage the pursuit of permissive administrative remedies. Further, defendant maintains that plaintiff's delay in prosecuting his claims is of such a magnitude that plaintiff must now adduce evidence justifying the delay.

According to defendant, the prejudice resulting from plaintiff's delay is manifest. Defendant claims that it may be liable to plaintiff for a significant amount of back pay for services that were neither required nor rendered. Also, defendant states that it is prejudiced by its inability to reconstruct the pool of records which the ROSB considered to determine the plaintiff's competitiveness for retention, because those records were destroyed.[2]

Though defendant insists that it has presented a *prima facie* showing of laches and is entitled to judgment, defendant has failed completely to address the fact that in both 1981 and 1983, the AFBCMR excused, in the interest of justice, plaintiff's failure to timely file for relief. In both years, the AFBCMR considered the merits of plaintiff's application. The decisions rendered in 1981 and 1983 now form the basis of plaintiff's claim. *See* Amended Petition

Pursuant to Rule 15, Paragraph 13 (filed May 9, 1984).

Plaintiff's appeal from the 1981 and 1983 AFBCMR decisions is necessarily timely, since this action was filed originally in 1980. The court can only surmise that the defendant's position is that the AFBCMR's action in 1981 and 1983 of excusing plaintiff's untimeliness was unjustified and incorrect. However, this court cannot challenge the AFBCMR's decision to entertain plaintiff's claim. *Riley*, 221 Ct.Cl. 308, 608 F.2d 441 (1979). Thus, the court finds that plaintiff's timely appeal from the AFBCMR's action is not subject to the defense of laches. *Muse*, 13 Cl.Ct. 372 (1987); *Braddock*, 9 Cl.Ct. 463 (1986). Accordingly, the court denies defendant's motion for summary judgment based on the affirmative defense of laches.

III. *The Decisions of the AFBCMR*

A. Standard of Review.

■ A military officer is entitled to have his service record considered on a "fair and equitable basis" by a selection or screening board. *See* 10 U.S.C. Section 8442(c); *Sanders v. United States*, 219 Ct.Cl. 285, 302, 594 F.2d 804, 814 (1979). The Secretaries of the military, acting through the various Boards for the Correction of Military Records, are empowered by Congress to "correct an error or remove an injustice" from a serviceman's record so that the record portrays accurately the serviceman's military career. 10 U.S.C. Section 1552. This court's review of a BCMR decision is limited:

Once a plaintiff has sought relief from the Correction Board, such plaintiff is

---

**2.** Defendant does not indicate on what date the ROSB records were destroyed, nor does defendant respond to plaintiff's assertion that the ROSB records were destroyed *after* plaintiff initiated this litigation. The court simply cannot ignore the persuasive logic of plaintiff's argument. An AFBCMR decision issued on May 21, 1981, after plaintiff filed suit in this court, contains a detailed explanation of the procedures employed by the ROSB in considering plaintiff for release from active duty. Yet, a March 17, 1983 AFBCMR decision relies upon the destruction of the records in denying plaintiff's third application. Plaintiff submits that the records were destroyed between 1981 and 1983. If

plaintiff is indeed correct, then the destruction of the ROSB records during the pendency of this suit is entirely defendant's fault. Thus, defendant cannot argue that plaintiff's actions have resulted in prejudice insofar as the ROSB records are concerned. In any event, the court is of the opinion that the date of destruction of the records is a material issue of fact which would preclude the court from granting defendant's motion for summary judgment based on laches. No further discussion of this issue is necessary, however, since the court is denying defendant's motion based on laches on other grounds and as a matter of law.

bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due.

*Sanders,* 219 Ct.Cl. at 298, 594 F.2d at 811 (1979); *see also Skinner v. United States,* 219 Ct.Cl. 322, 594 F.2d 824 (1979); *Braddock v. United States,* 9 Cl.Ct. 463 (1986). Thus, to overturn the Correction Boards' decisions in the instant case, plaintiff must show by cogent and clearly convincing evidence (1) a material legal error or injustice in the Correction Boards' proceedings, and (2) an adequate nexus between the error or injustice and his selection for involuntary release from active duty. *Hary v. United States,* 223 Ct.Cl. 10, 618 F.2d 704 (1980). Further, plaintiff must overcome the presumption that "administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979).

When reviewing a BCMR decision under a substantial evidence standard, the court may not simply look for evidence which supports a finding of fact. Rather, the court must take into account the weight of countervailing evidence to ascertain whether the fact finder reached a reasonable conclusion. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). While the court might disagree with the BCMR's decision, it cannot substitute its own judgment for the board's if reasonable minds could reach differing resolutions of a disputed fact. *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804 (1979).

The court recognizes that plaintiff's burden of proof is a difficult one to meet. Nonetheless, the plaintiff's case on its face warrants a meticulous and careful review of the entire record. Thus, in reaching a final determination of the merits of plaintiff's claims and in ruling upon the parties' motions, the court has given thorough consideration of the parties' arguments and supporting evidence.

1. The Missing OERs for the Periods January 6, 1962—August 27, 1962; May 1, 1963—November 9, 1963; August 1, 1966—January 22, 1967; and January 23, 1967—June 29, 1967.

In two of his three applications to the AFBCMR at issue in this case, plaintiff requested that a document, stating that through no fault of his own an OER was not rendered as required, be inserted in his official record for each of these periods of service. Further, plaintiff requested that the document reflect that the error should in no way adversely affect his promotion opportunities or assignment considerations.

The AFBCMR denied plaintiff's requests in its May 21, 1981 decision. The Board found that although it appeared that plaintiff could have qualified for an OER for each period, the plaintiff had failed to substantiate that he indeed met the requirements for the reports to be rendered. In its March 17, 1983 decision, the AFBCMR endorsed the May 1981 decision, but analyzed the additional evidence that plaintiff had submitted. Again, the Board determined that the plaintiff did not prove that he met the requirements for either an OER or a Letter of Evaluation (LOE). Plaintiff contends that the Board's conclusions ignore the weight of the extensive documentary evidence that he provided to the Board.

The court cannot find that the AFBCMR's determinations respecting these four missing OERs or LOEs are unsupported by the evidence, or are arbitrary and capricious. The Board did find in 1981 that plaintiff's evidence had not established that plaintiff met the necessary 90-day period of supervision for an OER. However, the Board also found that plaintiff was not entitled to relief because he had not complied with his regulatory obligation to determine the accuracy of his records and to seek timely administrative correction of any errors. AFM 35-14, the applicable regulation, required plaintiff to review his records at least every 24 months and to

work with the CBPO to produce any missing documents. The Board noted that plaintiff had an official records review on March 10, 1970, as evidenced by plaintiff's signature on AFPCM Form 190, Certification of Records Review, but that plaintiff did not raise then any issue with respect to these missing OERs. The Board found no evidence that plaintiff challenged the absence of the OERs until late 1979. Thus, the Board ultimately concluded that plaintiff's untimely application did not require a finding of probable error or injustice.

When plaintiff sought reconsideration of the Board's 1981 decision, plaintiff submitted evidence to prove the length of supervision during the periods for which he sought OERs. The Board reviewed the evidence. Nonetheless, the Board found no error in its 1981 decision and denied plaintiff's request for relief. The Board's conclusions in 1981 and 1983 are absolutely clear: "there is no documentation to support the applicant's position that he pursued the administrative avenues of correction available to him [at the time the OERs should have been rendered]." Plaintiff has not produced any countervailing evidence of record for the court to weigh against the Board's conclusions. Rather, the Board's decisions respecting these four OERs have adequate factual support. Therefore, the court will not disturb the Board's decisions regarding these four periods of plaintiff's service.

2. The OER for January 2, 1969—May 7, 1969.

The plaintiff requested in two of his applications to the AFBCMR that the 7–2 rating he received from Lieutenant Colonel Duker and Colonel Gianni for this period be raised to an overall 9–4, Outstanding, or alternatively, be removed from his record. The plaintiff relied on supporting statements submitted to the Board by Lieutenant Colonel Duker and Colonel Gianni to prove that the OER was factually inaccurate. In addition, the plaintiff contended that the rating officer considered "factors adversely affecting the ratings which had no business being in the ratings process" during preparation of the OER.

Lieutenant Colonel Duker stated that he was inexperienced in Air Force rating policies and erroneously rated the plaintiff according to the U.S. Army standards. Colonel Gianni explained in three separate statements that he was not totally aware of all of the plaintiff's accomplishments when endorsing Lieutenant Colonel Duker's 7–2 rating of plaintiff and that he was too conservative in his ratings because he was unfamiliar with governing Air Force rating policies. The AFBCMR fully considered the statements in its March 7, 1983 decision, but rejected them, stating:

... we are not inclined to favorably consider a request based simply on the fact that the rater and indorser now say they scored the applicant too low or that their opinions have changed, and that they would now rate him higher. Nor can it be favorably considered on the evidence currently presented; i.e., a letter over the signature of a retired Air Force colonel who states:

I now realize and admit I was not totally aware of all the many duties carried out by Major Murphy, his clearly superior abilities, outstanding growth potential, and exceptional effectiveness on the job.

Inasmuch as this officer furnished comments on a previous OER as well as three subsequent reports, wherein all contain a statement to the effect that his observations were based upon daily personal association with the officer, including one showing he was the actual rater; we now find it difficult to accept his statement that he was not aware of all the many duties carried out by the applicant. We also note the plea that the upgrading of the report to 9–4 would be in keeping with the applicant's demonstrated performance and his potential compared with his contemporaries but do not find it persuasive. We find no disparity shown between the rater's and indorser's comments on the report and the rating assigned, nor do we have documented performance that exceeds the rating awarded at the time ... An evaluation report is considered a true portrayal of an officer's performance unless suf-

ficient evidence is provided showing evaluators of the report were coerced to rate a member in a certain way; that some important fact relating to a member's performance during that period does not become known until a later period in time; or that some violation of the pertinent edition of the governing directive has occurred. We do not find evidence of any of the above conditions warranting relief.

This court is unable to find that the Board's analysis of the supporting statement was unreasonable, or that the Board's refusal to upgrade the 7–2 OER to a 9–4 OER was arbitrary and capricious. Plaintiff has failed again to convince the court that the Board lacked any basis for its determination. The court is of the opinion that the Board's determination was reasonable in light of the evidence.

The officers' statements were made from six to 11 years after the close of the OER rating period. Given the passage of time between the close of rating period and the date of the statements, it is reasonable for a trier of fact to reduce significantly the weight and credibility to be accorded to the statements. Further, some of the statements provide no clear explanation of the difference in rating policies which would lead to a severe underrating of plaintiff. In addition, the record does not reflect any effort on the officers' parts to correct similar mistakes they may have made. Thus, it appears that both officers were exhibiting exactly the kind of change of opinion that has been firmly rejected by this court in the past. *See Savio v. United States,* 213 Ct.Cl. 737, 553 F.2d 105 (1977). Therefore, the court is compelled to hold that the AFBCMR's findings with respect to the OER for this period are not arbitrary and capricious or unsupported by substantial evidence.

3. The Missing OER for June 17, 1972 —January 28, 1973.

In his 1979 application to the AFBCMR, plaintiff claimed that a Training Report, covering a 19–month period, including June 17, 1972—January 28, 1973, which appeared in his record was improper. Plain-

tiff requested that an OER reflecting a 9–4 rating be placed in his record for the June 17, 1972—January 28, 1973 period. In support of his request, plaintiff submitted a letter from Brigadier General Backman confirming that no OER had been prepared. General Backman's letter stated that plaintiff's "overall performance ... was significantly stronger than that reflected in the report ending [the previous rating period]." General Backman also telephoned the Correction Board Examiner to reiterate that his rating on plaintiff's OER covering June 17, 1972—January 28, 1973, would have been a 9–4.

The Board recognized that "[e]ither through omission or inadvertence, apparently an OER was not rendered for the period 17 June 1972 thru (sic) 28 January 1973, while the applicant was on active duty." Nevertheless, the Board denied plaintiff's request for an OER covering June 17, 1972—January 28, 1973. The Board held:

> We find no evidence the applicant brought the missing report to the attention of the CBPO or made any effort to have the period documented until after he was selected for involuntary release from active duty. Had he taken action in a timely manner, he no doubt could successfully have had either an OER or an appropriate document placed in his record.

While the Board did indicate that plaintiff was eligible to have at least an AF Form 77a, stating that the plaintiff was not rated for the period, inserted into his record, the Board failed to taken any corrective action.

Plaintiff included with his 1982 application to the Board a letter from General Backman which attested to plaintiff's unsuccessful efforts upon return from TDY to have the CBPO document the June 17, 1972—January 28, 1973 period of active duty. The letter also referred to the telephone call in support of plaintiff's 1979 AFBCMR application which General Backman placed in 1981 to the Board Examiner. The Board again rejected plaintiff's claim regarding the June 17, 1972—January 28, 1973 period, reiterating its position that

plaintiff had failed in his regulatory obligation to make a timely, administrative effort to request an OER be filed in his record. In addition, the Board referred to AFM 36–10 as a basis for denying plaintiff's request.

Plaintiff now contends that (I) the 1981 Board erred by refusing to consider the memoranda for record based upon General Backman's telephone call to the Board Examiner; (II) the 1981 Board acted in bad faith by providing to him altered copies only of the 1981 Record of Proceedings; (III) the 1983 Board failed to support by substantial evidence its reiteration of the 1981 Board's finding of untimeliness; and (IV) the 1983 Board misapplied AFM 36–10. Defendant contends only that plaintiff has failed to demonstrate that the AFBCMR decision to invoke the 18–month limitation of AFM 36–10 is unlawful. Defendant argues that unless the court rules as a matter of law that the regulation is unlawful, the court must uphold the AFBCMR decision. According to the defendant, a decision by the court reversing the Board, without a finding that AFM 36–10 is unlawful, would mean that the court is free to disregard Air Force regulations and apply its own notion of what procedures are to be followed in rating military personnel. After an exhaustive review of the 1981 and 1983 Records of Proceedings, the court concludes that the AFBCMR's 1983 decision reiterating its 1981 finding that plaintiff did not make a timely administrative effort to have an OER inserted into his record is unsupported by substantial evidence. In response to the Board's 1981 decision that he was not entitled to relief because he did not comply timely with his regulatory obligation to bring the missing OER to the CBPO's attention, plaintiff submitted a personal statement that he did indeed inform the CBPO of the missing OER. According to plaintiff's statement, the CBPO advised plaintiff that an OER was not required. Reasonable minds could conclude that this statement, standing alone, is self-serving and entitled to little weight. However, plaintiff included with his statement a letter signed by General Backman which lends support to plaintiff's contention.

This evidence is uncontroverted. Thus, there is no countervailing evidence for the court to weigh in ascertaining whether the Board reached a reasonable conclusion. In the absence of any countervailing evidence, the court must hold that the Board's finding is unsupported by substantial evidence. Accordingly, the court rules that the Board erred in denying plaintiff's request for an OER on the basis of its incorrect finding that plaintiff did not attempt to resolve the missing OER with the CBPO.

The AFBCMR further supported its 1983 decision by applying the 18–month rule found in AFM 36–10, ¶ 4–7(c). Contrary to defendant's contention, this court does not have to rule as a matter of law that AFM 36–10 is unlawful in order to overturn the AFBCMR decision. Rather, the court may merely determine that the BCMR's application of the regulation is unlawful. Therefore, the issue presented is whether the 18–month rule contained in AFM 36–10, ¶ 4–7(c) is a limitation upon the Correction Board's broad statutory authority to fashion equitable remedies for legal errors and fundamental injustices. In examining this issue, the court bears in mind that "[t]he construction of a statute by those agencies charged with its execution should be followed unless there are compelling indications that it is wrong." *Young v. TVA*, 606 F.2d 143, 145 (6th Cir.1979), *cert. denied*, 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 776 (1979).

AFM 36–10, ¶ 4–7(c) provides:

Late Report. A report intended to cover an unrated period of an officer's service will not be submitted if the time elapsed since the end of the reporting period is more than 18 months. If the custodian of the command personnel record group finds an unrated period in an officer's record with later reports on file and 18 months or more have elapsed since the end of the reporting period, he prepares AF Form 77(a) ...

AFM 36–10, ¶ 4–7(c) does not purport to delineate or circumscribe the powers of any administrative body such as the Correction Board, a statutorily created tribunal representing the Secretary of the Air Force.

The regulation addresses only those permissible actions which may be taken by the custodian of the command personnel record group. The "custodian of the command personnel record group" is merely the personnel officer entrusted with the responsibility to maintain the personnel records of service members within the command. If AFM 36–10, ¶ 4–7(c) had been meant to apply to the Correction Board, the regulation could have clearly stated so.

Moreover, AFM 36–10, ¶ 4–7(c) poses no arbitrary bar to the Correction Board's consideration of an application for any equitable relief within the review jurisdiction of the Correction Board. The applicable period for Correction Board review, found in AFM 31–3, ¶ 6, is within three years after discovery of the alleged error or injustice. However, the Board may excuse the failure to file within that time, if the Board finds it would be in the interests of justice to do so. Thus, AFM 31–3, ¶ 6, *mandates* that the Correction Board consider *all* applications filed within three years of the discovery of the error or injustice, but allows broad discretion to consider an application filed beyond the three-year period. 10 U.S.C. § 1552.

The Correction Board's application of AFM 36–10, ¶ 4–7(c), after excusing plaintiff's failure to file within the three-year period, was contradictory, unjustified and capricious. The Correction Board's decision to apply AFM 36–10, ¶ 4–7(c) limited its consideration of the merits of plaintiff's claims and deprived the plaintiff of the very forum AFM 31–3 was intended to provide. Further, the Board's application of AFM 36–10, ¶ 4–7(c) violated the Board's clear mandate to correct errors and injustices. Thus, the court is compelled to hold that the Board's action was arbitrary and constituted error.

The construction given by this court to both AFM 36–10 and AFM 31–3 is entirely consistent and in accordance with the clear language and intent of both regulations. Most important, the court's finding will allow the Correction Board to properly exercise its assigned powers to remedy clear injustice by correcting the error in plaintiff's record and inserting the merited OER. Neither *Ware v. United States*, 226 Ct.Cl. 579 (1981) nor *Watkins v. United States Army*, 721 F.2d 687 (9th Cir.1983), cited by the defendant, persuades this court otherwise, since neither specifically addresses AFM 36–10.

Further, the court is not convinced by defendant's argument that defendant has been unable to locate a single case where the court has entertained a claim which seeks to insert reports into a personnel record contrary to the directive of "governing regulations," i.e., AFM 36–10, ¶ 4–7C. In *Guy v. United States*, 221 Ct.Cl. 427, 608 F.2d 867 (1979), plaintiff alleged that his two nonselections for promotion and his subsequent separation from active duty were illegal because his record before both selection boards was missing an OER for August 14, 1968—May 15, 1969, which rated his performance as exceptionally fine. Plaintiff also contended that his record before the first selection board contained an unfair, biased and inaccurate OER and that his record before the second selection board contained yet another inaccurate OER. Plaintiff argued that the AFBCMR's decision failing to excise the two allegedly prejudicial OERs from his record and refusing to void his separation was arbitrary and capricious.

The Court of Claims held that the Correction Board did not err in denying plaintiff relief with respect to the two contested OERs. However, the court did find that the missing OER was prejudicial legal error with respect to plaintiff's passover in 1973. The court, in discussing plaintiff's claim, stated:

> The Correction Board did not make a factual finding as to whether this OER was in fact missing from plaintiff's records before the selection boards. Plaintiff discovered that the OER was missing from his records in the fall of 1972. In response to an inquiry the Records Maintenance Branch made the following statement:
>
> 1. The AFHQ Form 43 in question was initialed on 21 November 1972 when an OER for the period of 14

Aug. 68—15 May 69 was discovered to be missing from Major Guy's record by the file clerk.

\* \* \* \* \* \*

4. A determination cannot be made if the above mentioned OER had ever been received for file. *It is a fact that it was not in file* during the Microfilming of records *during the summer of 1972* when Major Guy's alfa record group was filmed. [Emphasis added by Court of Claims.]

There is no evidence showing that the OER was ever in plaintiff's records ...

Despite the Court's specific finding that no evidence existed proving that the August 14, 1968—May 15, 1969 OER was ever in plaintiff's records, the court ordered correction of plaintiff's personnel record. It is clear to this court that plaintiff raised the issue of his missing OER more than 18 months after the end of the reporting period. Thus, this court concludes that AFM 36–10, ¶ 4–7C did not operate to prohibit the *Guy* court from inserting an appropriate OER into plaintiff's record, *or at the very least*, to limit that court's consideration of the impact that the missing OER had on plaintiff's record. *See also Engels v. United States*, 230 Ct.Cl. 465, 678 F.2d 173 (1982) (AFBCMR and the Court of Claims determined that plaintiff was entitled to insertion of a required LOE which was missing from plaintiff's record.)

Since the court has determined that the AFBCMR's 1983 decision regarding plaintiff's June 17, 1972—January 28, 1973 period of active duty was arbitrary, capricious, and unsupported by substantial evidence, the court believes it is unnecessary to address plaintiff's contention that the 1981 Board erred by not considering two Memoranda for Record based upon telephone calls placed by General Backman and Colonel Taylor. However, plaintiff does make a related, serious charge that the Correction Board acted in bad faith to deny his 1979 application and then fashioned findings and conclusions to support the result. The plaintiff contends that "certified" copies of the Board's 1981 decision which he received from the Board were intentionally

altered to omit the Examiner's Note stating that the Board did not consider the Memoranda of Record. Indeed, the alteration of which plaintiff complains is perpetuated in the Administrative Record filed in this case.

Plaintiff bears a heavy burden in establishing bad faith. The court has noted that " 'it takes, and should take, well-nigh irrefragable proof to induce us ...' to find bad faith in the conduct of a Government Official." *United States Fidelity & Guaranty v. United States*, 230 Ct.Cl. 355, 366–67, 676 F.2d 622, 629 (1982). The defendant raises as a genuine issue of fact that "there is no evidence that '[t]he Record of Proceedings, documenting the AFBCMR's deliberations, was altered to conceal the fact that evidence crucial to plaintiff's cause had been rejected by the Acting Executive Secretary and was not even considered by the Correction Board.' " However, defendant fails to support its contention in any way. Mere denials in pleadings are patently insufficient to raise a genuine issue. Rather the party asserting the issue of fact must provide affidavits, documenting evidence, or specific references to the record to establish the existence of a controverted fact. *See* RUSCC 56.

Further, the defendant has advanced no credible explanation for the omission of the Examiner's Note in the copies of the Record of Proceedings sent to plaintiff. Defendant states only that the reasonable inference which can be drawn by the existence of two very different "certified" Record of Proceedings is administrative error in what was copied and provided to plaintiff. The court believes that such an "inference" is improbable. Plaintiff has submitted evidence that the Board twice provided him with purportedly certified copies of its 1981 decision which were materially different from those copies provided to the defendant. This court can only speculate as to the extent of the wrath it would incur from the Court of Appeals if it attempted to serve one party to a suit an order or opinion substantially different from that served on the other party, or if it attempted to certify for appeal a record

containing pertinent, unprivileged information denied to one party. Plaintiff's evidence, when viewed in conjunction with defendant's utter failure to adequately explain the existence of the two versions of the 1981 Record of Proceedings, does support the plaintiff's contentions that the Board's actions constitute bad faith in this case. Thus, the court can only conclude that the "certified" Record of Proceedings provided to plaintiff by the Board were deliberately altered, with the intent to deny plaintiff the benefit of the knowledge that the Board did not consider as valid evidence two telephone calls in support of plaintiff's application.

The plaintiff tendered an OER for the period (June 17, 1972—January 28, 1973), reflecting a 9–4 rating which was adequately supported by the evidence. It was error for the Correction Board to arbitrarily and capriciously reject the proposed OER under the circumstances of record shown in this case.

4. The period January 10—May 14, 1974

In all three of his applications to the AFBCMR, plaintiff requested that the 7–3 OER covering the period January 10—May 14, 1974, prepared by Colonel D.W. Bennett and indorsed by Brigadier General B.F. Starr, Jr., be voided and removed permanently from his official records. Plaintiff maintained in his applications that an AF Form 2095, executed on January 10, 1974, properly designated Brigadier General B.F. Starr, Jr., as the reporting official. He contended that a subsequent AF Form 2095, executed on March 12, 1974, which purported to change retroactively the reporting official to Colonel Bennett, violated governing regulations. Thus, plaintiff argued that the 7–3 OER was illegal and appeared improperly in his record.

In 1976, the AFBCMR denied plaintiff's application without a hearing. Since AFM 31–3 in 1976 did not require the Board to provide a written record of proceedings, the court cannot determine the Board's rationale for denying the request. In 1981, the AFBCMR acknowledged plaintiff's contention of "technical inaccuracies" in the

preparation of AF Form 2095. However, the Board held:

> In the absence of a direct statement from the applicant's former Wing Commander that he indeed was the reporting official, and that only he could have rated the applicant, it is reasonable to assume this was a necessary change sanctioned by the Wing Commander, and (sic) thereby rendering him the indorsing official.

In addition, the Board Stated:

> With regard to the accuracy of the report, contrary to the applicant's contention that the Vice Wing Commander could not properly evaluate him, we would point out that the Wing Commander, as the endorsing official, was in a position to alter any element of the report with which he disagreed, based upon his direct knowledge and observation of the applicant's performance.

In 1983, the AFBCMR gave scant consideration to plaintiff's contentions in his third application. The AFBCMR said:

> Applicant's request that the report rendered for the period 10 January through 14 May 1974 be voided and removed from his records because of technicalities in the issuance of an AF Form 2095 was reviewed in 1975 and again in 1981, and we believe all aspects of his contentions have been fully examined and are found wanting. We do not find that the minor differences in the dates cited on the AF Form 2095 constitute a harmful error requiring voidance of a report that is substantially accurate in its portrayal of performance.

Plaintiff renews before this court his contention that a review of the March 12, 1974 AF Form 2095, which purported to change his rating official, discloses numerous violations of AFM 36–10 and AFM 30–130. He argues that the Board's refusal to recognize the illegality of the March 12, 1974 AF Form 2095 and to delete the 7–3 OER from his record was arbitrary, capricious and contrary to law. The defendant seems to contend that the court cannot void "what is essentially an assignment from one reporting official to another based on allegations of technical defect (sic) in a

form meant only to memorialize the discretionary decision already taken." The defendant does not further develop its argument other than to state, "as controlling precedent has established, the challenged designation of reporting official (sic) is presumed to have been done correctly, lawfully and in good faith."

The Court of Claims stated in *Skinner v. United States*, 219 Ct.Cl. 322, 594 F.2d 824 (1979):

> It is important ... to note that in the Air Force rating system there are always two officers, senior to the officer being rated, who are signatories on his report. One is the rater who is the immediate supervisor. The second is senior to the immediate supervisor and is called the "indorsing official." *Id.* at 327, 594 F.2d at 827.

AF Form 2095 is used to formally designate an officer's rater and indorser. Given the importance of the Air Force rating system, AF Form 2095, then, is a rated officer's very life blood.

The defendant attempts to characterize the designation of a reporting official as a discretionary decision "memorialized" by AF Form 2095. The Air Force, though, has promulgated comprehensive regulations that govern the preparation and issuance of AF Form 2095. It is axiomatic that once a department prescribes regulations, the regulations limit the permissible exercise of the department's discretion. *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed. 2d 1403 (1957).

AFM 30–130 stipulates that personnel actions reflected on AF Forms 2095 cannot be amended or rescinded, but can be revoked if a number of specific requirements are met. Rule 8 and Note 2 of Table 3–2, AFM 30–130, clearly provide that if an AF Form 2095 is accomplished to change an individual's rating officer, but not his DAFSC or duty title, the "date supervision begins will approximate the date AF Form 2095 is initiated." In addition, Rule 35 of Table 3–1, AFM 30–3, directs that Sections I and V of AF Form 2095 be completed when the form is used to change reporting official. Further, AFM 30–130 requires that data concerning revocation of an existing AF Form 2095 be annotated in the "Remarks" section of the newly issued AF Form 2095.

In both 1981 and 1983, the AFBCMR acknowledged the deficiencies in the March 12, 1974 AF Form 2095. Thus, plaintiff implicitly overcame the presumption that the challenged designation was accomplished correctly, lawfully and in good faith. Nevertheless, the 1981 Board assumed that, in the absence of a direct statement to the contrary from Brigadier General Starr, Jr., the change in reporting officials was sanctioned by him. The Board's assumption violates the Air Force's own regulation that *requires* on AF Form 2095 the signature of the officer's commander authorizing the change of reporting officials. Indeed, the lack of a commander's signature in Section V of AF Form 2095 is strongly indicative of the fact that the change was never approved. Further, the Board's assumption imposes on any applicant challenging the propriety of an AF Form 2095 a nearly impossible burden of proof. Therefore, the court finds that the 1981 Board acted arbitrarily and capriciously.

The 1981 Board's justification that, as the indorsing official on plaintiff's OER, the Wing Commander "was in a position to alter any element of the report with which he disagreed," must fail also. The March 12, 1974 AF Form 2095 purporting to change plaintiff's rating official to the Vice Wing Commander was illegal and totally ineffective. While the Vice Wing Commander was certainly plaintiff's superior officer, the uncontroverted evidence of record established that the Wing Commander was plaintiff's immediate supervisor. The January 10, 1974 AF Form confirms this evidence. Accordingly, the Vice Wing Commander was the improper rating official, making the Wing Commander the incorrect indorsing official. Pursuant to the January 10, 1974 AF Form 2095, the Wing Commander was the only proper reporting official and Commander, 22nd Air Force was the only correct indorsing official. The Wing Commander's indorsement of the 7–3 OER in no way may lend propri-

ety to an illegally prepared document. *See, Hary v. United States*, 223 Ct.Cl. 10, 19, 618 F.2d 704, 709 (1980) (Court rejected defendant's argument that the concurrence of the indorsing official established the accuracy of a rating.)

Further, the 1983 Correction Board erred in excusing "minor differences in dates" as harmless. The Board failed completely to provide evidence to support its determination. The Board only alluded to a practice of publishing AF Forms 2095 with retroactive effective dates. However, the Board failed to explain why the practice does not violate the clear, governing regulations. On this record, the court cannot accept the Correction Board's finding of harmless error. The harm of the illegal AF Form 2095 is readily apparent: plaintiff was not informed as to the identity of his reporting official in contravention of AFM 36–10. The reasons assigned by the Correction Board for retaining the January 10—May 14, 1974 OER are not sound. The court, therefore concludes that this OER should be stricken from plaintiff's record.

5. The Period June 1, 1974—June 4, 1975.

Plaintiff requested in all three of his applications to the AFBCMR that an OER reflecting a 9–4 rating be placed in his record for his June 1, 1974—June 4, 1975 period of service as Station Manager, Far East Network, Okinawa. Plaintiff contended that in accordance with AFM 36–10, Chapter 4, ¶ 3d, a report for this period of active duty was mandatory. In support of his second application, plaintiff provided a letter from Brigadier General C.F. McClain and a Letter of Evaluation from Colonel Taylor, his indorsing official. Plaintiff supplemented his third application with an OER prepared by Major Lapp, plaintiff's rating official, and Colonel Taylor. Both Major Lapp and Colonel Taylor included explanatory letters with the OER they prepared.

Again, because AFM 31–3 in 1976 did not require the AFBCMR to provide a written record of proceedings, the court cannot determine the Board's rationale for denying plaintiff's first application. The 1981

Board relied on AFM 36–10, ¶ 5–3b(2) to support its decision to deny plaintiff's request. The Board stated:

[I]t is noted that AFM 36–10, paragraph 5–3b(2), dictates that OERs will not be submitted on officers who retire, resign or are released or if their separation from active duty will be effective within 120 days after the closing date of the report. There is a note, however, in this subparagraph, to the effect that should the significance of the ratee's performance warrant recording, the reporting official has the *option* of preparing a "CRO" report on the ratee's retirement, resignation or release. (Emphasis added by AFBCMR).

The Board concluded that no report was required for the June 1, 1974—June 4, 1975 period, "since it appears that the rendition of an OER was contrary to the governing directive and or at least at the option of the rater." Thus, the Correction Board found that "the failure to submit an OER on the applicant was not contrary to the regulation."

In 1983, the AFBCMR stated that plaintiff appeared to support his assertion that he was entitled to an OER for the June 1, 1974—June 4, 1975 period by relying on the September 15, 1975 edition of AFR 36–10, which was not in effect at the time of plaintiff's separation from active duty. However, the Board noted that the applicable regulation stated:

Reports are mandatory for officers separating from active duty who will be gained to Air Force Reserve training categories A, B, C, or D, or Air National Guard Units.

The Board found that "the applicant's record reveals that when he was released from extended active duty on *26 June 1975* he was returned to the Indiana Air National Guard. He was discharged from the Indiana Air National Guard on *27 June 1975* and, thus did not receive federal recognition from that organization." (Emphasis in original.) The Board concluded: "We do not find evidence in the record or in [plaintiff's] submission that [plaintiff] was assigned to a Reserve training category

requiring a report to be rendered. Therefore, the prior decision of his Board is sustained."

Plaintiff continues to contend in the instant action that the applicable regulation mandated the preparation of an OER for the June 1, 1974—June 4, 1975 period. Thus, plaintiff argues that the AFBCMR's refusal to insert into his record the proffered OER and the AFBCMR's creation of nonexistent criteria for the entitlement to an OER violated Air Force regulations and was arbitrary and capricious. Defendant responds that the AFBCMR's action is fully supported by the record. Further, defendant maintains that since a decision concerning the June 1, 1974—June 4, 1975 OER would have no effect on the separation ordered by the ROSB, any disposition as to plaintiff's claim concerning this OER would not trigger a monetary consequence standing alone, because a favorable order by the court would not result in reinstatement.

The court realizes that its decision regarding the June 1, 1974—June 4, 1975 period in no way affects the ROSB's action. Yet, the court believes that defendant's argument ignores disingenuously both the facts of this case and the relief plaintiff seeks. Since plaintiff was a "dual status" member of the Air Force, he was considered for, but passed over for, promotion to the Reserve grade of lieutenant colonel in 1979 and 1980. Plaintiff, therefore, retired in the Reserve grade of major. Plaintiff has contended repeatedly that his nonselections for promotion to lieutenant colonel were improper because they were based upon an unfair and inaccurate personnel record. Plaintiff has argued that the Reserve Officer Promotion Authority should have considered a record which included a 9–4 OER to which plaintiff claims he was entitled under Air Force regulations. Thus, the court's decision regarding this OER can potentially trigger a monetary consequence, if the court corrects the record and instructs the Secretary of the Air Force to consider plaintiff's promotion to Reserve grade of lieutenant colonel.

AMF 36–10, effective November 30, 1974, provided the following guidance on when to submit an OER:

4–3. When to Submit AF Form 707:

c. Reports are optional for officers who retire, resign, or are released or if their separation from active duty will be effective within 120 days of the closing date of the report except as noted in d below. The rater is responsible for contacting the CBPO (DPMQE) to obtain report notice or information when needed for reports which are not projected or suspended by the CBPO.

d. Reports are mandatory for Reserve Officers separating from active duty who will be gained to Air Force training categories A, B, C, or D, or Air National Guard units. Such reports require 120 days supervision.

The language of this regulation is too plain to be misunderstood or misconstrued. The regulation contains no requirement for "federal recognition" by the National Guard. Nor does the regulation specify a minimum amount of time that an officer must remain in the Air National Guard in order for an OER to be rendered. Further, the regulation does not state that in order to be eligible for an OER a separated Reserve officer must not be ultimately assigned to the non-affiliated reserve. The court finds that the Correction Board erred in establishing these criteria.

It is uncontested that plaintiff was briefly "gained" to the Indiana Air National Guard upon his involuntary separation from active duty in the Air Force. The clear import of AFM 36–10, ¶ 4–3(d) means that if the plaintiff had at least 120 days of supervision by Major Lapp prior to his release to the Indiana Air National Guard, plaintiff was entitled to an OER. Indeed, the regulation makes it absolutely clear that issuance of an OER was mandatory, not discretionary. The record establishes that Major Lapp supervised plaintiff for more than 120 days. Thus, plaintiff is entitled to the 9–4 OER for the period June 1, 1974—June 4, 1975.

*The Nexus Between the Errors in Plaintiff's Personnel Record Prior to the Period June 1, 1974—June 4, 1975 and the Decision of the Reserve Officer Screening Board*

■ The Court has determined that legal errors existed in plaintiff's personnel record as presented to the ROSB and that the AFBCMR's refusal to take *any* corrective action was arbitrary and capricious. However, not all errors warrant judicial relief. *Riley v. United States,* 221 Ct.Cl. 308, 608 F.2d 441 (1979); *Guy v. United States,* 221 Ct.Cl. 427, 608 F.2d 867 (1979); *Hary v. United States,* 223 Ct.Cl. 10, 618 F.2d 704 (1980). The court must consider whether the errors in plaintiff's record were so egregious as to demand voiding of the ROSB's selection of plaintiff for involuntary release from active duty. The "fundamental principal permeating" the court's consideration of the nexus issue "is whether the claimant's record before the [ROSB] still portrayed his service career on a 'fair and equitable basis,' as the statutes require." *Hary,* 223 Ct.Cl. at 19, 618 F.2d at 709, *citing Sanders v. United States,* 219 Ct.Cl. 285, 303, 594 F.2d 804, 814 (1979); 10 U.S.C. §§ 3442(c), 8442(c) (1976). If plaintiff's record before the ROSB falls below this standard, plaintiff's separation is unlawful. *Riley,* 221 Ct.Cl. at 312, 608 F.2d at 443.

The nexus inquiry

focuses on two subordinate and limited questions—issues which are separate but interrelated: First, does the presence of the defective OERs in plaintiff's record make that record appear worse than it would absent those OERs, so that in the sense he was prejudiced by the OERs? Second, was plaintiff's comparative position before the [ROSB] such that, even

assuming that there was some prejudice associated with the defective OERs, it was unlikely that he would have been [retained] in any event?

*Hary,* 223 Ct.Cl. at 21, 618 F.2d at 710. As explained in *Engels v. United States,* 230 Ct.Cl. 465, 678 F.2d 173 (1982), the plaintiff has the burden of establishing the existence of legal error. The plaintiff then must "make at least a *prima facie* showing of a substantial connection" between the error and the adverse action, in this case, selection by the ROSB for involuntary separation. *Engels, Id.* at 468, 678 F.2d at 175. The ultimate burden of showing harmless error rests with the defendant, though. Thus, the defendant must prove "that, despite the plaintiff's *prima facie* case, there was no substantial nexus or connection." *Id.* Because the court does not have to find that the plaintiff would in fact have actually been retained in the absence of the errors, but merely that retention was not definitely unlikely or excluded, the nexus test places squarely on the defendant the "risk that the court remains unconvinced that the proven error can be deemed harmless, insubstantial in effect, or unimportant." *Engels,* 230 Ct.Cl. at 469, 678 F.2d at 176.

As in *Hary,* the court cannot rely on the Correction Board's conclusion of lack of nexus between the errors plaintiff alleged and plaintiff's involuntary separation. The Board failed completely to correct those errors which the court has found to be illegal. Thus, the Board did not account for the impact of the errors on plaintiff's record before the ROSB. Given these circumstances, the court must examine the evidence in the extensive administrative record to arrive at a reasonable conclusion on the nexus issue.[3]

---

**3.** The defendant has suggested that the court remand the case to the Secretary of the Air Force for a determination of whether a nexus exists between any legal error in plaintiff's record and his selection for release. The Court of Claims and the Claims Court have pursued this general course in some cases. *See, e.g., Hary,* 223 Ct.Cl. at 20, 618 F.2d at 710, N. 12. In the instant case, the court declines to adopt defendant's suggestion. The age of this case and the exhaustive, prior administrative litiga-

tion demand resolution of the nexus issue by this court. *See, Id.,* N. 13. This case has already been pending for nearly nine years. Before plaintiff filed suit, he sought relief from the AFBCMR. After plaintiff filed suit, the court stayed proceedings twice to allow the AFBCMR to act on plaintiff's applications. The court believes that it would be a futile waste of time to simply refer the matter to the Board for a fourth review. Further, the court believes that the AFBCMR could make no more a factually

404

The court is satisfied that the errors it has determined existed in plaintiff's record before the ROSB caused that record to appear significantly worse than it should have appeared. Plaintiff was entitled to a 9–4 OER—the highest possible—for the period June 17, 1972—January 28, 1973. In addition, plaintiff was entitled to have the 7–3 OER, rendered for the January 10—May 14, 1974 period, excised from his record. "If a Service Secretary place[s] before the Board an alleged officer's record filled with prejudicial information and omits documents equally pertinent which might have mitigated the adverse impact of the prejudicial information, then the record is not complete, and it is before the [ROSB] in a way other than as the statute prescribes." *Sanders*, 219 Ct.Cl. at 303, 594 F.2d at 815, *citing Weiss v. United States*, 187 Ct.Cl. 1, 7, 408 F.2d 416, 419 (1969).

The court is equally convinced that plaintiff has presented a *prima facie* case that this inaccurate record influenced the ROSB. Plaintiff's record was otherwise very good. Indeed, on the strength of his record before 1971, he was promoted to permanent major. After selection for permanent major, plaintiff continued to perform solidly and exhibited uninterrupted, steady, upward progress. Plaintiff performed so superbly during the June 17, 1971—January 28, 1973 period that he merited a 9–4 OER. Because the 7–3 OER rendered for January 10—May 14, 1974 was illegal and should have never appeared in plaintiff's record, the 9–4 OER would have been the most recent rating before the ROSB. This 9–4 rating might have been essential to, or at least might have triggered plaintiff's retention.

Defendant has not produced comparative data of the type presented in *Hary*. Comparative data allows the court to determine how many officers were ahead of the plaintiff for retention with and without corrections to the record. This data is often

considered a useful approximation of the general effect of an OER on plaintiff's overall record. The Administrative Record does contain some data regarding the ROSB's action. According to briefing statistics, the ROSB selected for release 11.2 percent of the officers considered within plaintiff's grouping. Plaintiff was one of 23 majors separated on June 27, 1975. However, statistics such as those found in the Administrative Record have been firmly rejected as providing no real evidence concerning a specific plaintiff's comparative chances for retention. *See Hary*, 223 Ct.Cl. at 22, 618 F.2d at 710.

In the absence of comparative data, courts have considered qualitative factors to measure prejudice. *See Riley*, 221 Ct.Cl. 308, 608 F.2d 441; *Guy*, 221 Ct.Cl. 427, 608 F.2d 867. The court has already determined that plaintiff's corrected record presented "a picture of steady advancement and increased competence and efficiency." *Riley*, 221 Ct.Cl. at 312, 608 F.2d at 443. Defendant has produced no evidence of record that rebuts the court's finding. Defendant has not submitted any affidavits from senior military officers suggesting that plaintiff's record is below average. To the contrary, the Administrative Record contains numerous laudatory letters testifying to plaintiff's excellence as an officer. Nor has defendant even argued that with the requested corrections to the plaintiff's record, plaintiff would not have been retained in any event.

Rather, defendant has only argued that the decisions of the AFBCMR regarding the nexus issue were not arbitrary and capricious. However, the court disagrees. In considering the impact of the errors on plaintiff's record *before the ROSB*, the 1981 Board concluded:

A further indication that he has not suffered harmful error is the fact that he was promoted to both temporary and permanent Reserve of the Air Force ma-

accurate determination than the court. The 1983 Board refused to consider the nexus between any legal errors in plaintiff's record and his selection for release because no benchmark records of the ROSB exist. The court does note that defendant has never responded to plaintiff's

contention that the ROSB records were destroyed after plaintiff filed this action. In deciding the nexus issue, however, the court realizes that it is not a "super correction board," and that it is bound to apply well-established precedent.

jor with the alleged documents missing from his record and with the "unjust OERs" intact. These facts lead us to conclude that the applicant's record was substantially accurate at the time of his selection for involuntary release from active duty; and that no basis exists warranting reversal of the decision of the ROSB in question.

The court finds the Board's reasoning that plaintiff's record was substantially accurate at the time of his selection for involuntary release from active duty because plaintiff was promoted to both temporary and permanent major to be unsound. Plaintiff attained the rank of permanent major effective February 1, 1971. The Board may well be correct that plaintiff's record *at the time of his promotion to permanent major* was substantially accurate. Indeed, the court has found that the Board was not arbitrary in its decisions regarding plaintiff's contentions of error in his record *before* 1971. However, the ROSB considered plaintiff for involuntary separation in November, 1974, more than three years *after* plaintiff was promoted to permanent major. Plaintiff contended, and the court has found, that two legal errors existed in his record for those three years between his promotion to permanent major and his selection for involuntary separation by the ROSB. The court cannot fathom how the Board can possibly support its conclusion that plaintiff's record before the ROSB was substantially accurate simply because plaintiff was promoted to both temporary and permanent major. Such logic obviously ignores the three year period between plaintiff's promotion and plaintiff's selection for involuntary separation. In 1983, the Board merely presumed that the ROSB considered plaintiff on a basis which fairly portrayed plaintiff's career. Thus, the court is compelled to hold that the defendant has not sustained its burden of proving harmless error. Therefore, the court finds that a nexus does exist between the errors in plaintiff's record and his involuntary separation. Accordingly, plaintiff is entitled to reinstatement to active duty effective June 27, 1975.

### The Nexus Between the Errors in Plaintiff's Personnel Record and the Reserve Officer Promotion Authority

After enlisting in the Regular Air Force following his involuntary separation, plaintiff became a "dual status" member. In 1979 and 1980, the Reserve Officer Promotion Authority considered, but did not select, plaintiff for promotion to the Reserve grade of lieutenant colonel. Plaintiff requested that the AFBCMR set aside the two nonselections. In 1981, the Board determined that plaintiff's record was substantially accurate and found no basis to warrant disturbance of ROPA's decisions. The 1983 Board did not address specifically the ROPA action. Before this court, plaintiff argues that the Board's decision regarding his nonselections were arbitrary and capricious. Plaintiff thus seeks promotion to lieutenant colonel.

This court generally has no power to order the promotion of an officer to a higher rank. *Riley v. United States,* 204 Ct.Cl. 865, 529 F.2d 531 (1974); *Brenner v. United States,* 202 Ct.Cl. 678 (1973); *Clinton v. United States,* 191 Ct.Cl. 604, 606, 423 F.2d 1367, 1368 (1970). "While many statutes and regulations govern selection board procedure, and this court can and will review selection board actions to determine whether such procedure has been complied with, this only confers on an officer the legal right to be fairly considered for promotion but does not confer any legal right or entitlement to promotion." *Guy,* 221 Ct.Cl. 427, 440, 608 F.2d 867, 874 (1979). Thus, in the instant case, the court is limited to considering whether plaintiff's service record before ROPA in 1979 and 1980 portrayed plaintiff's career fairly and equitably.

This court has already determined that the record before the ROSB contained significant harmful, legal errors. ROPA twice passed over plaintiff for promotion to lieutenant colonel based upon the same tainted record. In addition, plaintiff's record lacked a 9–4 OER for the period June 1, 1974—June 4, 1975, which the court has held, was mandatory. In light of these circumstances, the court simply cannot find

that despite the errors in plaintiff's record, it was unlikely that plaintiff had any chance of promotion by the two ROPA boards. *See, Engels,* 230 Ct.Cl. at 475, 678 F.2d at 179. Therefore, plaintiff's record must be expunged of the nonselections by ROPA.

## CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the plaintiff's motion for summary judgment. Accordingly, the court denies in part and grants in part the defendant's motion for summary judgment. Plaintiff is entitled to reinstatement as major to active duty as of June 26, 1975. The court will by appropriate order schedule proceedings to consider further relief to which plaintiff is entitled consistent with this opinion.

IT IS SO ORDERED.